635 S.E.2d 549

**The STATE, Respondent,**

v.

**Kenneth NAVY, Jr., Appellant.**

**No. 4143.**

Court of Appeals of South Carolina.

Heard March 7, 2006.

Decided July 31, 2006.

Rehearing Denied Sept. 25, 2006.

400

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport; and Solicitor Warren Blair Giese, all of Columbia, for Respondent.

BEATTY, J.:

Kenneth Navy appeals his conviction for homicide by child abuse, arguing the trial court erred in: (1) admitting three inculpatory statements; and (2) refusing to grant a new trial as a result of the State's treatment of defense witnesses and closing argument. We reverse.

## FACTS

On February 9, 2003, Navy and his neighbor, Terry Crocker, were at Navy's residence watching television. Navy's twenty-three-month-old son, Kenneth Navy, III (the "victim"), was upstairs taking a nap. At some point the victim became distressed, and 911 was called. Emergency workers responding to that call observed Navy administering CPR to the victim. The victim was transported to the hospital and pro-

nounced dead shortly after arrival. Navy informed the emergency workers, the nurse who greeted him at the hospital, and a child life specialist at the hospital that the victim had been born four months premature, had lung and heart problems, and had fallen from his highchair a few days prior to his death without any serious injuries. Navy also stated he went upstairs to check on the victim, who had been fussy that day, he went downstairs to get the victim a bottle, and the victim was not breathing when he returned. Navy gave essentially the same version of events to a police detective at the hospital and to the coroner.

The coroner examining the victim's body discovered four rib fractures that had occurred at different times over a period of weeks prior to the victim's death. The coroner opined the victim had been suffocated. A tipster called and met with another coroner from the same office to say that she believed the victim had been suffocated and pushed down the stairs. The tipster, whom police were able to identify, wished to remain anonymous and was not identified at trial because she feared retaliation from her family and Navy's family.

After learning of the autopsy results and the information from the tipster, Lieutenant James Smith and Sergeant Lancy Weeks drove to Navy's home on the day of the victim's funeral visitation and asked if Navy would be willing to accompany them to the police station for more questioning. After Navy inquired as to whether the questioning could wait until after the funeral, he was informed that it could not wait. Navy was not placed under arrest, but he agreed to ride with the officers in their car to the police station. Navy was not given his *Miranda*[1] warnings, and he gave a statement at 9:50 a.m. describing the events on the day the victim died. Navy initially stated that he went to check on the crying victim in his crib, he patted him on the back to comfort him, and he went downstairs to get a bottle. Upon his return, he realized the victim was having difficulty breathing, he panicked, ran up and down the stairs, and then returned to find the victim lifeless. The officers typed up the statement ("first written statement"), had Navy sign it, and then informed a shocked

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Navy that the victim died from suffocation and had broken ribs.

Smith then asked Navy to describe exactly how he comforted the victim. Navy stated he may have popped the victim on his back and patted the victim on his mouth to stop him from crying ("oral statement"). Navy was then given his *Miranda* warnings, and he signed a written waiver agreeing to talk with police at 11:35 a.m. In his second written statement given at 11:40 a.m., Navy indicated he put his hand over the victim's mouth when he could not get the child to be quiet. He stated he did not hold his hand there. Navy further stated: "I knew I knocked out his breath and I figured he would catch it by the time I got back up to the room. I heard him making that noise. It was like he was still trying to catch his breath. That was when I panicked. He quit breathing...." Navy admitted he could have placed his hand over the victim's nose as well.

After taking Navy's second written statement, Weeks consulted with the coroner. The coroner opined that Navy had to have held his hand over the victim's mouth and nose for more than just a brief period. Police confronted Navy with this information, and Navy gave a third written statement at 12:25 p.m. in which he said he could have held his hand over the victim's mouth and nose for a minute, but not more than two minutes. Navy stated the child was gasping for breath when he removed his hand. Navy was questioned for a total of approximately three hours.

Navy was placed under arrest for homicide by child abuse. He moved to suppress the oral statement and the second and third written statements prior to trial. After the *Jackson v. Denno*[2] hearing, the trial court denied the motion to suppress, finding the first statement was not a custodial statement and the second and third statements were given after Navy was given his *Miranda* warnings.

At trial, the State presented evidence that although the victim had serious lung difficulties immediately after his premature birth, the victim was healthy at the time of his death. Dr. Teresa Baggett, the pediatrician who treated the victim a

---

**2.** *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

few months prior to his death, testified that when the victim was born, he required oxygen and an apnea monitor for a few months, later suffered from an asthma-type condition called reactive airway disease, and required treatment with Albuteral, a nebulizer, monthly shots, and injections of Synergist to protect him from the respiratory syncytial virus (RSV). Dr. Baggett stated the victim was having difficulty breathing in August 2001, and the parents were instructed to perform aggressive chest physiotherapy, or pounding of the chest, to loosen lung secretions. At his October 2002 visit, the victim was wheezing and had an ear infection. However, when the victim returned for a follow up visit in November 2002, Dr. Baggett testified his lungs were clear and she advised the victim's mother to decrease the frequency of his nebulizer treatments.

A radiologist examined the victim's x-rays from his August 2001 treatment and from his autopsy. The radiologist testified that although the first of the three August 2001 x-rays was of poor quality, the other two showed no rib fractures. The radiologist also opined that the four rib fractures visible in the victim's autopsy x-ray were caused by forceful trauma and could not have occurred from a fall or during aggressive chest physiotherapy or CPR. Further, Dr. Clay Nichols, the coroner who conducted the victim's autopsy, testified the victim's lungs were clear, normal, and not inflamed or filled with mucous at the time of death.

Navy presented evidence to show that he was not a violent person, that the victim's death could have resulted from his lung deficiencies, and that the rib fractures were old fractures from August 2001 that had not healed. Navy's orthopedic surgery expert, Dr. Thomas Trancik, testified the victim had four rib fractures based on the first August 2001 x-ray, which was of poor quality. He admitted he could not locate the fractures in the subsequent two August 2001 x-rays. Trancik also opined the rib fractures could be consistent with the administration of CPR at the time of the victim's death. During cross-examination, the State commented that Trancik was "no expert," Navy objected to the comment, it was struck from the record, and Navy did not request further instructions to the jury or a mistrial.

Navy's neighbor, Terry Crocker, Navy's sister, the victim's speech therapist, Navy's wife, and Navy's father all testified that they never witnessed Navy being violent with his children. Crocker, who was in Navy's home at the time the victim stopped breathing, testified that Navy was not upset that day, that he witnessed Navy go upstairs to check on the victim, and that Navy returned downstairs very fast, saying the victim was not breathing.

Navy testified he never abused his children and did not suffocate his son. During cross-examination, the solicitor asked Navy to admit that "every time we took a break when the jury was gone you were laughing and cutting up, weren't you?" Navy's objection was sustained and no further instructions were requested. When the solicitor began screaming at Navy, the court instructed the solicitor to treat Navy "with respect." The State also brought out on cross-examination of the defense witnesses that although Navy had never been convicted of a violent crime, police had been called to his home numerous times for violent arguments, he had been suspended from high school for punching a coach, he had been accused of attempting to assault a sixteen-year-old girl, and he had been in a physical altercation with his father.

Navy was convicted of homicide by child abuse and sentenced to twenty years imprisonment. His motion for a new trial was denied, and this appeal follows.

## STANDARD OF REVIEW

■■■■ In criminal cases, the appellate court sits to review errors of law only and is bound by the factual findings of the trial court unless clearly erroneous. *State v. Wilson,* 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001). Appellate review of whether a person is in custody for *Miranda* purposes is limited to a determination of whether the trial judge's ruling is supported by the record. *State v. Evans,* 354 S.C. 579, 583, 582 S.E.2d 407, 409 (2003). Further, the trial court's decision to deny a motion for a new trial will not be disturbed absent an abuse of discretion. *State v. Covington,* 343 S.C. 157, 163, 539 S.E.2d 67, 69 (Ct.App.2000).

## LAW/ANALYSIS

### I. Suppression of Statements

Navy argues the trial court erred in refusing to suppress his three inculpatory statements. We agree.

"The purpose of the *Miranda* warnings is to apprise the defendant of [his] constitutional privilege not to incriminate [himself] while in the custody of law enforcement." *Evans,* 354 S.C. at 583, 582 S.E.2d at 409. *Miranda* requires that warnings be given to a suspect after he or she has been taken into custody or deprived of his or her freedom in any significant way. *Id.* at 583, 582 S.E.2d at 410 (citing *Miranda,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). This language has been interpreted to mean a "formal arrest or detention associated with a formal arrest." *State v. Easler,* 327 S.C. 121, 127, 489 S.E.2d 617, 621 (1997). Whether a suspect is in "custody" for *Miranda* purposes is an objective determination based upon the totality of the circumstances, including "the individual's freedom to leave the scene and the purpose, place and length of the questioning...." *Id.* "The relevant inquiry is whether a reasonable man in the suspect's position would have understood himself to be in custody." *Bradley v. State,* 316 S.C. 255, 257, 449 S.E.2d 492, 493–94 (1994). The custodial determination is not based upon the subjective views of the suspect or the interrogating officers. *Easler,* 327 S.C. at 128, 489 S.E.2d at 621.

### A. Inculpatory Oral Statement

Navy argues the trial court erred in refusing to suppress his inculpatory oral statement because he was in custody at the time and he was not given his *Miranda* warnings prior to making the statement.

At the *Jackson v. Denno* hearing, Lieutenant James Smith testified that Navy voluntarily accompanied him and Sergeant Lancy Weeks back to the station to discuss the case. Smith testified he did not administer *Miranda* warnings because Navy was not under arrest, Smith informed Navy that he was not under arrest, and Navy was very cooperative with investigators despite being upset and crying. Smith stated he would not have taken Navy to the Sheriff's Department if Navy did

not want to go. Once at the Sheriff's Department, Smith testified Navy was given a soda and escorted outside to smoke a cigarette. According to Smith, Navy would have been allowed to leave had he requested to do so.

Smith admitted he had the coroner's autopsy report prior to questioning Navy. After about one hour of questioning, Navy signed the first written statement that was substantially similar to the story given at the hospital. Smith testified he then confronted Navy with the coroner's opinion that the victim had been suffocated and had four fractured ribs. In response to Smith's question regarding how he comforted the victim, Navy gave the oral statement that he popped the victim on his back and may have patted the victim's mouth to calm the crying. At that point, they took a break so Navy could smoke another cigarette outside. Smith testified he escorted Navy outside to smoke a cigarette because no one was allowed to wander the Sheriff's Department alone. Smith stated Navy was still not in custody and would have been allowed to go home if he had requested to do so. However, out of an abundance of caution, Smith stated he gave Navy his *Miranda* warnings when they returned to his office.

Navy testified at the *Jackson v. Denno* hearing that he was extremely upset and had not slept or eaten in three days when Smith and Weeks requested that he accompany them to give a statement. Navy stated he only completed the ninth grade in school and had difficulty reading cursive writing. Navy denied that he was given *Miranda* warnings after his oral statement, testifying that either he was not given *Miranda* warnings until his third statement or that he could not recall when he was given *Miranda* warnings. Navy testified that the first written statement, substantially similar to the statement he gave at the hospital, was the only correct statement. He claimed the officers placed the second and third written statement along with the first written statement in front of him, the officers required him to sign all three typed statements at one time before he could go home, and Navy did not read the statements before signing them.

Citing *State v. Evans*, 354 S.C. 579, 582 S.E.2d 407 (2003), Navy's counsel argued any reference to his oral statement that he "popped" the victim on the back should be suppressed

because Navy was operating under an emotional disability and was not given *Miranda* warnings prior to making the statement. The trial court determined Navy was not in custody at the time he voluntarily gave his first statement [3] because he was free to leave. The court distinguished *Evans* from Navy's situation, finding there was a "bullying atmosphere" in questioning Evans and the police ignored her requests for help.

In *Evans*, the mentally disabled defendant was aggressively questioned at the police station about a fire at her home that killed her three children. During her three-hour interview, police repeatedly told her they did not believe her theories of how the fire could have started, and they ignored her repeated requests to "get her some help." Evans was escorted to and from the bathroom, and relatives who had accompanied her to the police station were not allowed to see her. The trial court suppressed the inculpatory statement Evans eventually gave, finding Evans was in custody at the time and was not given her *Miranda* warnings. In making the custodial determination, the court: found Evans was not free to leave; considered the fact that the interrogation occurred in a back office at the police station; considered the fact that the interrogation was three hours long; and was concerned with the officers' purpose in their method of questioning. The supreme court held the trial court's order reflected that the court objectively considered the totality of the circumstances in determining that Evans was in custody. *Evans*, 354 S.C. at 583–84, 582 S.E.2d at 410.

Reviewing the totality of the circumstances, we find the present case is substantially similar to *Evans* such that the trial court erred in finding Navy was not in custody at the time of the oral inculpatory statement. Navy was informed by officers that questioning at the station could not wait. Thus, despite Navy's testimony that he willingly accompanied the officers, one could reasonably interpret the officers' refusal to delay the questioning until after the funeral as a mandate to accompany the officers. Navy was further transported to the Sheriff's Department in the backseat of a patrol car, rendering him unable to return home on his own. Further, Navy was

---

**3.** It is unclear from the record whether the court was referring to the first written statement or to the inculpatory oral statement.

not allowed to walk about the Sheriff's Department freely, and he was accompanied for smoke breaks. Although the officers claimed they merely wanted a statement of the events on the date of the victim's death, Navy was repeatedly questioned for a length of time. Finally, the officers were familiar with the autopsy report prior to questioning Navy, indicating the purpose of the questioning was to obtain an inculpatory statement.

Viewing the length, location, and purpose of the questioning, a reasonable person would believe themselves to be in custody. Accordingly, Navy's oral statement should not have been admitted.

### B.  Second and Third Written Statements

■ Navy argues the trial court erred by failing to suppress his second and third written statements because they were obtained as a result of information learned from the oral inculpatory statement made prior to *Miranda* warnings.

■ Generally, an "initial failure to administer *Miranda* warnings before a statement is given does not taint a subsequent statement, made after a suspect has been fully advised of and has waived his *Miranda* rights, when both statements are voluntary." *State v. Campbell*, 287 S.C. 377, 379, 339 S.E.2d 109, 110 (1985); *see Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.").

However, the United States Supreme Court has recently held unconstitutional the police tactic of "question-first," where officers intentionally question a suspect until inculpatory information is given and then provide *Miranda* warnings prior to having the suspect repeat the inculpatory information.

*Missouri v. Seibert,* 542 U.S. 600, 613, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (noting that *Miranda* warning given mid-interrogation, after a defendant had given an unwarned confession, was ineffective in informing a suspect that she could decide not to speak further with police after essentially saying everything there was to say; thus, the confession repeated after the warning was given was inadmissible at trial). The plurality in *Seibert* noted as follows:

> [W]hen *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine,* 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

*Seibert,* 542 U.S. at 613–14, 124 S.Ct. 2601.

The *Seibert* plurality went on to distinguish the admissibility of subsequent statements elicited in an *Elstad*-type of confession from statements elicited pursuant to the "question-first" tactic.[4] Noting that the failure to give a warning prior to the confession in *Elstad* was merely an oversight whereas the "question-first" tactic was purposefully designed to undermine *Miranda* warnings, the *Seibert* court pointed out several considerations to determine whether mid-interrogation *Miranda* warnings are effective, rendering subsequent statements admissible:

> The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings

---

4. In *Elstad,* the defendant was arrested for burglary at his home. Officers stopped in the living room on the way out of the home to inform his mother of the charges. While in the living room, Elstad confessed to being at the scene of the burglary. Officers then gave Elstad *Miranda* warnings prior to obtaining subsequent statements. The United States Supreme Court held that the simple failure to administer *Miranda* warnings prior to a confession, where no evidence of coercion or calculation was present, did not render subsequent, post-warning statements inadmissible. *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.

*Seibert*, 542 U.S. at 615–16, 124 S.Ct. 2601.

Applying the *Seibert* factors, we find the questioning of Navy was an integrated, coordinated, and continuing interrogation such that giving warnings mid-interrogation was ineffective and rendered the second and third written statements inadmissible. Navy was questioned at the police station, over a period of three hours, and by the same officers. The officers asked similar questions with each statement, and the three statements overlapped in content. The officer's questions to Navy post-*Miranda* warning were related to the oral inculpatory statement, indicating the officer treated the "second round as continuous with the first." Further, because the officers were familiar with the coroner's opinion that the victim was suffocated prior to questioning Navy, it can hardly be said that the failure to give *Miranda* warnings prior to obtaining the oral inculpatory statement was inadvertent, as was the case in *Elstad*. Because the officers' actions in the present case are substantially similar to those in *Seibert*,[5] we

---

**5.** We are cognizant of the fact that *Seibert* was decided a week after the trial in this case, and Navy's counsel did not refer to the "question-first" tactic in moving to suppress Navy's statements. However, Navy's counsel argued that the written statements should be suppressed because Navy did not give a voluntary waiver. He argued the statements were taken from Navy "in furtherance and in addition and based upon unconstitutionally gathered information, violating his rights by getting the information about 'popping' before he had been *Mirandized*." Thus, the substance of Navy's argument is preserved for review.

find the trial court erred in finding the second and third statements were admissible.

To summarize, we find Navy was in custody at the time he gave his oral inculpatory statement, and the mid-interrogation *Miranda* warning given to Navy in this situation was not effective in advising him of his rights or the consequences of abandoning them. Accordingly, we reverse the trial court's finding that all three inculpatory statements were admissible.

## II. Solicitor's Closing Argument

Citing *Toyota of Florence v. Lynch,* 314 S.C. 257, 442 S.E.2d 611 (1994), Navy argues the trial court erred in refusing to grant him a new trial because the State's closing argument was outrageous. We disagree.

The trial court is given broad discretion in determining the appropriateness of a solicitor's closing argument. *State v. Rudd,* 355 S.C. 543, 548, 586 S.E.2d 153, 156 (Ct.App. 2003). The trial court's ruling will not be disturbed on appellate review absent an abuse of discretion. *Id.* An appellant must prove both an abuse of discretion and resulting prejudice to warrant reversal. *State v. Sierra,* 337 S.C. 368, 373, 523 S.E.2d 187, 189 (Ct.App.1999).

"A solicitor's closing argument must not appeal to the personal biases of the jurors nor be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences to it." *Humphries v. State,* 351 S.C. 362, 373, 570 S.E.2d 160, 166 (2002). In reviewing a solicitor's closing argument, the court must determine whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *State v. Caldwell,* 300 S.C. 494, 504, 388 S.E.2d 816, 822 (1990). Improper comments do not require reversal if they are determined not to be prejudicial to the defendant. *Rudd,* 355 S.C. at 550, 586 S.E.2d at 157. Arguments of counsel are not considered so inflammatory as to require a reversal where "counsel responds in kind to a previous argument of opposing counsel." *Dial v. Niggel Assocs., Inc.,* 333 S.C. 253, 258, 509 S.E.2d 269, 271 (1998). "On appeal, an appellate court will review the alleged impropriety of the solicitor's argument in the context of the entire record, includ-

ing whether the trial judge's instructions adequately cured the improper argument and whether there is overwhelming evidence of the defendant's guilt." *Rudd*, 355 S.C. at 550, 586 S.E.2d at 157.

During the solicitor's closing argument, he evaluated all of the evidence and testimony presented in Navy's defense. The solicitor referred to Navy's assertions in closing, his witnesses, or other evidence presented in Navy's defense as "lies," "liars," or "untrue" statements on at least seventeen occasions. Navy never objected to any of these statements. In his later motion for a new trial, Navy argued he was entitled to a new trial because the solicitor's argument was "extremely inflammatory" by attacking Navy's character, by referencing all the uncharged violent offenses, and by calling Navy's witnesses liars. Navy admitted he did not object to the closing argument, but he argued he was entitled to a new trial pursuant to *Toyota of Florence v. Lynch* due to the outrageousness of the closing argument. The court denied the motion for a new trial.

Generally, a party must make a contemporaneous objection to improper arguments or the objection is waived. *Dial*, 333 S.C. at 256–57, 509 S.E.2d at 271; *State v. Young*, 364 S.C. 476, 494, 613 S.E.2d 386, 395 (Ct.App.2005). However, our supreme court has held that "even in the absence of a contemporaneous objection, a new trial motion should be granted in flagrant cases where a vicious, inflammatory argument results in clear prejudice." *Toyota of Florence v. Lynch*, 314 S.C. 257, 263, 442 S.E.2d 611, 615 (1994) (holding a new trial should be granted, despite the lack of contemporaneous objections to closing argument, where counsel used posters in closing argument that invoked racial stereotypes and were highly prejudicial). The *Toyota of Florence v. Lynch* court described the circumstances of that particular case as "extraordinary," and the court noted that it did not condone the failure to make a contemporaneous objection. *Id.*; *State v. Peay*, 321 S.C. 405, 413, 468 S.E.2d 669, 673–74 (Ct.App.1996) (noting the supreme court in *Toyota of Florence v. Lynch* "did not condone the failure to contemporaneously object, and described the circumstances in that case as 'extraordinary'").

The solicitor's closing argument in the present case was certainly aggressive. However, we do not find "extraordinary" circumstances present in this case that would excuse the failure to make a contemporaneous objection. Navy's defense at trial centered on his claim that he was not a violent person and that his son's injuries were the result of his lung disease and medical treatments. In this context, the solicitor's closing argument was a direct response to Navy's defense and merely pointed out the problems with Navy's argument based on the evidence of record. We do not find these remarks so inflammatory as to fall under the *Toyota* decision. *See Dial,* 333 S.C. at 258, 509 S.E.2d at 271 ("In this case, counsel's 'deceit and lies' remark was in response to opposing counsel's repeated accusation of deception. In context, this remark was not so inflammatory as to come within the ambit of our decision in *Toyota.*"). Accordingly, Navy's failure to raise any objection to the solicitor's closing argument waived the issue for review and the trial court did not err in refusing to grant Navy a new trial.[6]

## CONCLUSION

We find the trial court erred in admitting Navy's voluntary oral statement and the second and third written statements. However, the court did not err in refusing to grant Navy a new trial based on the solicitor's closing argument. Nevertheless, because the court erred in admitting the three statements, Navy's conviction and sentence are

**REVERSED.**

HEARN, C.J., and HUFF, J., concur.

---

6. Navy also argues that he was entitled to have a new trial pursuant to *Toyota* due to the outrageousness of the State's trial tactics in bringing out his prior violent acts, pointing out that he was laughing during breaks to the jury, and saying Trancik was not an expert. *Toyota,* however, only addressed outrageous conduct during closing argument. We decline to extend *Toyota* to apply to general trial tactics and cross-examination.