Kevin **EDWARDS**, Appellant,

v.

**UNITED STATES, Appellee.**

No. 02–CF–1068.

District of Columbia Court of Appeals.

Argued Nov. 29, 2005.

Decided May 3, 2007.

Corinne Beckwith, Public Defender Service, with whom James W. Klein and Giovanna Shay, Public Defender Service, were on the brief, for appellant.

John P. Gidez, Assistant United States Attorney, with whom, Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Jay I. Bratt, Assistant United States Attorney, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and GLICKMAN and KRAMER, Associate Judges.

KRAMER, Associate Judge:

■ The appellant, Kevin Edwards, was convicted following a jury trial of First–Degree Premeditated Murder While Armed, Possession of a Firearm During a Crime of Violence, and Carrying a Pistol Without a License. He was sentenced to concurrent terms of thirty-nine, twelve, and five years, respectively. Edwards now argues that the statements he made to the police after they read him his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), should have been suppressed under the standard announced in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), decided after his conviction but while this appeal was pending.[1] While

---

1. "[A]ll newly declared rules of law must be applied retroactively to all criminal cases

conceding, in light of *Seibert,* that the police acted inappropriately in failing to Mirandize Edwards before beginning their questioning, the government argues that the admission of Edwards' initial account of the murder was harmless and that his ultimate confession was properly admitted. We are compelled to "sound the warning" to police in this jurisdiction concerning the "deliberate failure of the police to inform a criminal suspect promptly of his rights under *Miranda." Hill v. United States,* 858 A.2d 435, 437–38 (D.C.2004) (quoting *United States v. Brown,* 737 A.2d 1016, 1021 n. 8 (D.C.1999) (citations omitted)). We reverse and remand the case for a new trial.

## I.

Deon McCorkle was shot and killed sometime after 5:00 p.m. on January 7, 2001. A witness told Detective Brett Smith that he saw a man get into a car and drive away after the shooting. The witness described the car to Detective Smith, who broadcast a lookout for the vehicle. A short time later, the police stopped a car matching the transmitted description and, after a brief foot chase, apprehended Edwards. Before Edwards was apprehended, Officer Wayne David saw him remove something from his waistband and toss it to the ground. Officer David retrieved the object, a black semi-automatic handgun. From the time he was apprehended until his interrogation began, Edwards made a number of unprompted statements, such as "F* *k a homicide beef," and "Murder was the charge that they gave me," apparently lyrics from a popular rap song.

Edwards waited in an interrogation room for approximately two hours while Detective Smith conducted his investigation at the murder scene. At around 8:00 p.m., Detective Smith arrived at the station and "formulated a game plan" to interview Edwards. He entered the interrogation room, introduced himself, and explained to Edwards that he was familiar with the area of the shooting and with the "crews" that were there. Detective Smith testified he was "letting him know that I was a well-educated police officer and detective, that I was familiar with the streets, what was going on, who was beefing with who, trying to make him feel at ease, that he wasn't dealing with someone ignorant to his plight." Detective Smith also stated, "I wanted [Edwards] to understand that ... I could relate to him, and that a bunch of BS wasn't going to fly with me. . . . I wanted to give him the impression that ... lies weren't going to work [and] that I had a clear picture of what was going on."

After introducing himself, Detective Smith asked Edwards "to tell [him] what happened, why [was Edwards t]here, you know, what's all this about?" He also asked Edwards "how he became involved in all of this tonight." Detective Smith acknowledged at trial that Edwards was in custody at that time and that he knew that his questioning could elicit an incriminating answer, but maintained that he "just wanted to hear what he was going to offer as an explanation."

Edwards responded that he had approached McCorkle to talk with him about a "beef" he was having with one of McCorkle's associates. While they were talking, a masked man approached, shot McCorkle, threw the gun in Edwards' direction, and ran off. Edwards then told Detective Smith that he picked the gun up, got into his car, and sped away. After Edwards

---

pending on direct review or not yet final. . . ." *(Maurice) Davis v. Moore,* 772 A.2d 204, 226

(D.C.2001) (en banc).

gave this statement, at 8:36 p.m., Detective Smith advised Edwards of his *Miranda* rights "because he had incriminated himself with the weapon" and "because what he just told me was obviously, to me, a complete and utter lie." Edwards stated that he understood his rights and initialed a PD–47 "Advice of Rights" card.

Detective Smith then went "back through [Edwards'] story" and told Edwards that he did not believe it. Detective Smith asked Edwards "some specific questions about things that didn't make sense to [him]," and Edwards repeated the same account. After about fifteen more minutes of interrogation, Detective Smith "stepped out" of the interview room. Another police officer, Detective Anthony Patterson, arrived and told Detective Smith that he knew Edwards from being a "beat cop" in Edwards' neighborhood and asked if he could speak with him. After another fifteen to twenty-minute session, Detective Patterson came out of the interrogation room and informed Detective Smith that Edwards "basically gave it up."

Edwards then repeated his new story to Detective Smith. He stated that he had walked up to McCorkle to discuss the "beef" when he saw that McCorkle had his hands in his pockets or was reaching for his pockets. Although he did not see a weapon, Edwards told Detective Smith that he was afraid for his life because he had known McCorkle to own guns and thought McCorkle might be armed. Edwards pulled out his gun and shot McCorkle several times. Detective Smith subsequently videotaped Edwards' statement.

Before trial, Edwards moved to suppress his statements, arguing that their admission would violate his Fifth Amendment right against self-incrimination. *See* U.S. CONST. AMEND. V ("No person ... shall

be compelled in any criminal case to be a witness against himself. . . ."). The trial court denied the motion. The court found "there was some police strategy at play in [Detective Smith's] mind" when he initially withheld Edwards' *Miranda* warnings and noted that he "[didn't] think they should have done it this way." Despite his misgivings, the trial judge found that there had not been any coercion. Ultimately, the court concluded that Edwards' statements were voluntary and admissible.

At trial, the government called multiple witnesses who gave somewhat conflicting accounts of the shooting. The one eyewitness who actually saw the shots being fired, a fourteen-year-old boy, testified that McCorkle's hands were extended in front of him when the assailant pulled out his gun. He further stated that McCorkle was gesturing with his hand while he and the shooter were talking and that, in the thirty seconds he watched the discussion, he could see the victim's left hand for about five seconds and his right hand for about twenty seconds. The prosecution also provided ballistics evidence linking the gun recovered during Edwards' flight to the bullets that killed the victim, but it did not introduce any fingerprint evidence.[2]

In closing argument, the prosecutor discussed Edwards' statements to Detectives Smith and Patterson. He contended that the statements were given after a voluntary *Miranda* waiver and used them to argue that Edwards had a motive for murder and that his self-defense story was false.

## II.

Two seminal Fifth Amendment cases, *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Missouri*

---

2. In the defense case, Edwards submitted testimony and stipulations regarding McCorkle's past acts of violence. He also submitted evidence that one of McCorkle's associates had shot at him while he was in his car.

*v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), provide the legal framework that we must apply to Edwards' claim that his statements should have been suppressed. In *Elstad,* which the government relied on at the pre-trial motions hearing in arguing that Edwards' post-*Miranda* statements were admissible,[3] police officers went to the home of an eighteen-year-old burglary suspect with a warrant for his arrest. *Elstad, supra,* 470 U.S. at 300, 105 S.Ct. 1285. As one of the officers escorted his mother into the kitchen to explain the situation, the other officer remained with the suspect. *Id.* The officer asked Elstad if he knew why they were there and he responded that he did not. *Id.* at 301, 105 S.Ct. 1285. The officer then asked Elstad if he knew a person named Gross, to which Elstad responded that he did and that he had heard that there had been a robbery at the Gross house. *Id.* The officer told Elstad that he believed that Elstad had been involved in the robbery and Elstad replied, "Yes, I was there." *Id.* After being transported to the sheriff's headquarters, the police read Elstad his *Miranda* rights, which Elstad waived before providing the police with a full confession. *Id.* at 301–02, 105 S.Ct. 1285.

Elstad moved to suppress his statement and confession because his response to the questioning at his house had "let the cat out of the bag" and the subsequent confession was a "fruit of the poisonous tree." *Id.* at 302, 105 S.Ct. 1285. The Supreme Court rejected these arguments, deciding that it would be an

> unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances cal-

culated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. *Id.* at 309, 105 S.Ct. 1285. The Court held that "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Id.* at 310–11, 105 S.Ct. 1285.

Nineteen years later, the Supreme Court limited its holding in *Elstad.* In *Seibert,* the appellee's twelve-year-old son, who had cerebral palsy, died in his sleep. *Seibert, supra,* 542 U.S. at 604, 124 S.Ct. 2601. Seibert feared that she would be charged with neglect because of bedsores on her son's body and, in her presence, two of her sons and two of their friends formed a plan to burn the family's mobile home, thereby incinerating the body. *Id.* They also planned to leave Donald Rector, a mentally ill teenager living with the family, in the home to avoid any appearance that Seibert's son had been left unattended. The group carried out their plan and Rector died in the fire. *Id.*

Five days after the fire, police awakened Seibert at 3:00 a.m. in the hospital where one of her sons was being treated for burns he sustained in the fire. *Id.* The arresting officer brought her to an interview room where she remained alone for fifteen to twenty minutes. *Id.* Another officer then questioned Seibert without *Miranda* warnings for thirty to forty minutes until she admitted that she knew Rector was meant to die in the fire. *Id.* at 604–05, 124 S.Ct. 2601.

After this admission, the officer gave Seibert a twenty minute break. *Id.* Fol-

---

**3.** The government also relied on this court's decision in *(Robert) Davis v. United States,* 724 A.2d 1163 (D.C.1998), which applied the *Elstad* rule. The *Seibert* plurality cited *Davis* as

an example of the "question-first practice" that it rejected. *Seibert, supra,* 542 U.S. at 611 n. 3, 124 S.Ct. 2601.

lowing the break, the officer turned on a tape recorder, read Seibert her *Miranda* rights, and obtained a signed waiver of those rights. *Id.* He then resumed questioning her by asking, "Ok ... we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" *Id.* The officer then confronted Seibert with her prewarning statements until she adopted them all. *Id.*

At trial, Seibert moved to suppress her statements. During the suppression hearing, the interrogating officer testified that he made a " 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.' " *Id.* at 605–06, 124 S.Ct. 2601. He further acknowledged that Seibert's ultimate recorded statement was "largely a repeat of information...." *Id.* at 606, 124 S.Ct. 2601.

The Missouri Supreme Court vacated Seibert's conviction. The Supreme Court affirmed and held that the admission of her statements violated Seibert's Fifth Amendment rights. *Id.* at 607, 124 S.Ct. 2601. A plurality of four justices observed that "*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Id.* at 608, 124 S.Ct. 2601. Noting that the "question-first" strategy employed in Seibert's case was a strategy used across the country, the plurality concluded, "The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 610–11, 124 S.Ct. 2601.

In considering Seibert's case, the plurality held,

The threshold issue when interrogators question first and warn later is ... whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture?

*Id.* at 611–12, 124 S.Ct. 2601. The plurality concluded that "the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content" and that "[a] more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision." *Id.* at 613, 124 S.Ct. 2601. It noted that "telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given," the tactic used by Detective Smith, "could lead to an entirely reasonable inference that what [the suspect] has just said will be used, with subsequent silence being of no avail." *Id.* at 613, 124 S.Ct. 2601. The plurality distinguished *Elstad* by pointing out that *Elstad* involved an "oversight" that "may have been the result of confusion as to whether the brief exchange qualified as custodial interrogation ..." and that it constituted a good-faith *Miranda* mistake. *Id.* at 614–15, 124 S.Ct. 2601 (quoting *Elstad, supra,* 470 U.S. at 315–16, 105 S.Ct. 1285).

The plurality found that the differences between *Seibert* and *Elstad* embodied the relevant considerations in determining whether *Miranda* warnings given midstream can be effective. These factors include (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and the setting of the first and

second" interrogations, (4) "the continuity of police personnel," and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615, 124 S.Ct. 2601.

Justice Kennedy concurred in the judgment, providing the decisive fifth vote. He agreed with the plurality that *Elstad* was rightly decided, but believed that *Seibert* was different because "[t]he police used a two-step questioning technique based on a deliberate violation of *Miranda.*" *Id.* at 620, 124 S.Ct. 2601. Justice Kennedy emphasized that "the interrogating officer here relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial. The postwarning interview resembled a cross-examination." *Id.* at 621, 124 S.Ct. 2601.

In lieu of the plurality's focus on whether the *Miranda* warnings were effective when they were given, Justice Kennedy "would apply a narrower test applicable only in the infrequent case ... in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622, 124 S.Ct. 2601. Justice Kennedy's view was,

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures [4] are taken before the postwarning statement is made.

*Id.* With this background, we turn to the issues raised here.

4. Justice Kennedy indicated that "curative measures" might include a break in time and circumstances from the prewarning statement or an additional warning statement explaining "the likely inadmissibility of the prewarning custodial statement...." *Id.*

## III.

Edwards challenges the admission of both of his post-*Miranda* statements, that is, his "masked man" account, and his subsequent self-defense version.[5] In light of *Seibert*, not yet decided at the time of the trial court's ruling, the government concedes that the trial court erred in admitting Edwards' post-*Miranda* "masked man" story, which was virtually identical to his pre-warning statement. It maintains, however, that this error was harmless. Thus, there are two questions before us on appeal: (1) whether this conceded error was harmless beyond a reasonable doubt, and (2) whether the trial court's admission of Edwards' subsequent account, that he killed the victim in self-defense, constitutes reversible error under *Seibert*.

■ On appeal from the denial of a motion to suppress, we review the trial court's legal conclusions *de novo*. *E.g., Lewis v. United States,* 632 A.2d 383, 385 (D.C.1993). In conducting this analysis, we "must defer to the trial judge's findings of evidentiary fact." *Womack v. United States,* 673 A.2d 603, 607 (D.C.1996). Applying these standards, we hold that the admission of both statements constituted reversible error.

## IV.A.

■ While the government concedes that the trial court erred in admitting Edwards' post-*Miranda* repetition of his "masked man" account, it maintains that "this was an exculpatory statement, and any error in its admission was harmless," a standard that the government has the burden of proving beyond a reasonable doubt.

5. Edwards' pre-*Miranda* statements, including the first version of his "masked man" account, were not admitted at trial.

*See, e.g., Smith v. United States,* 529 A.2d 312, 317–18 (D.C.1987) (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).[6] "That standard requires us to decide 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Id.* at 317 (quoting *Chapman, supra,* 386 U.S. at 23, 87 S.Ct. 824).

■ As Edwards correctly points out, "The record in this case reveals exactly how ... ostensibly 'exculpatory' statements can become a key aspect of the government's evidence against a criminal defendant." During closing argument, the government argued that Edwards' change in story from there being a "masked man" to his acting in self-defense was evidence of his guilty conscience. Such differing accounts, argued the prosecutor,

> [are] usually the result of people who are ashamed by ... what it is that they have done, afraid of the consequences of what they have done.... The fact that you finally get the opportunity to talk to the police and tell your side of the story, but you tell a story that has nothing to

do with self-defense. That's evidence that you know what you did was wrong. The prosecutor formulated this argument with the goal of undermining Edwards' self-defense theory. Given the limited evidence in the record to contradict Edwards' self-defense theory other than his erroneously admitted statement, there is a "reasonable possibility" that the statement and the prosecutor's arguments based on it contributed to the jury's Murder I conviction. *See Smith, supra,* 529 A.2d at 317.[7]

For these reasons, the conceded error cannot be said to be harmless beyond a reasonable doubt. Thus, we must vacate the verdict and remand the case for a new trial. Because this is an issue of first impression in this jurisdiction,[8] however, we also address the issue of whether the admission of Edwards' self-defense story violated his Fifth Amendment rights "in the interest of facilitating consideration of this issue on remand." *Hubbard v. Chidel,* 790 A.2d 558, 571 (D.C.2002).

### IV.B.

■ The second question before us is whether the trial court erred in admitting

---

6. The government has failed to provide any supporting argument or authority for its conclusory assertion that the admission of Edwards' "masked man" account was harmless. Yet even when the government has not properly briefed the issue of harmlessness, we can rule that the error was harmless if the "harmlessness is obvious." *Randolph v. United States,* 882 A.2d 210, 223 (D.C.2005). This point is academic, however, because the error here was not harmless under either standard.

7. Moreover, because the police elicited the "masked man" statement before Mirandizing Edwards, Edwards may have thought that statement was admissible regardless of whether or not he had first been given his rights. Then, upon being interrogated regarding how unbelievable that story was, Edwards could have logically concluded that he had nothing to lose by attempting to change that story.

8. Though we have previously addressed *Seibert* in *McCoy v. United States,* 890 A.2d 204, 206 (D.C.2006), the government there conceded that the statements at issue in that case were inadmissible. More recently, we applied *Seibert* in an entirely different context in *Hairston v. United States,* 905 A.2d 765 (D.C. 2006). *Hairston* addressed a situation where police laid out in detail the evidence against the accused before Mirandizing him and obtaining a statement. That scenario is markedly different from this case where the officers obtained information from Edwards before reading him his *Miranda* rights. *See also United States v. Gonzalez–Lauzan,* 437 F.3d 1128, 1137–38 (11th Cir.2006) (police officers asked *no questions during the first stage of* the interrogation, instructed the suspect not to speak, and read him his *Miranda* rights immediately when the suspect spoke contrary to the officers' instructions).

Edwards' statement that he shot McCorkle in self-defense. After considering the facts of the police interrogation and the opinions issued by the Court in *Seibert*, we conclude that this case is more analogous to *Seibert* than it is to *Elstad*. Accordingly, we conclude that the admission of Edwards' self-defense account was also error.

■ Because there was no majority opinion in *Seibert*, "[T]he holding of the Court may be viewed as that position taken by those members who concurred in the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Justice Kennedy's opinion is generally considered to be narrower than the plurality opinion.[9] Since there is some disagreement concerning the precise analysis that *Seibert* mandates,[10] however, we will analyze this case under both Justice Kennedy's opinion and the plurality's test. Because we conclude that the statements in this case should have been suppressed under either standard, we need not determine the precise analysis that follows from the opinions in *Seibert*.

Justice Kennedy found that the statements in *Seibert*, unlike those in *Elstad*, should have been suppressed because the police officers in *Seibert* intentionally deployed a two-step interrogation tactic, using the admissions obtained pre-*Miranda* to obtain the post-*Miranda* statements. *Seibert, supra*, 542 U.S. at 620–21, 124 S.Ct. 2601. While Justice Kennedy did not decide who bears the burden of showing that the police did or did not employ a two-step interrogation technique, "Placing that burden on the prosecution is consistent with prior Supreme Court decisions that require the government to prove the admissibility of a confession before it may come into evidence." *United States v. Ollie*, 442 F.3d 1135, 1142–43 (8th Cir.2006) (citing *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). Applying Justice Kennedy's analysis to the facts of this case, we conclude that the government has failed to meet its burden. It is apparent from several aspects of the record that the police obtained Edwards' self-defense statement using a two-step interrogation process more akin to that employed in *Seibert* than the questioning at issue in *Elstad*.

---

9. See *United States v. Williams*, 435 F.3d 1148, 1157–58 (9th Cir.2006) ("Although the plurality would consider all two-stage interrogations eligible for a *Seibert* inquiry, Justice Kennedy's opinion narrowed the *Seibert* exception to those cases involving deliberate use of the two-step procedure to weaken *Miranda's* protections."); *United States v. Kiam*, 432 F.3d 524, 532–33 (3d Cir.2006) (applying Justice Kennedy's test in finding that law enforcement officials had not performed a deliberate two-step interrogation); *United States v. Mashburn*, 406 F.3d 303, 308–09 (4th Cir.2005) ("In *Seibert*, Justice Kennedy concurred in the judgment of the Court on the narrowest grounds."); *United States v. Briones*, 390 F.3d 610, 613 (8th Cir.2004) ("Because Justice Kennedy relied on grounds narrower than those of the plurality, his opinion is of special significance.").

10. As the government points out, Justice Kennedy's test is narrower than the plurality's in that it would only apply to the deliberate use of a two-step procedure, but, within that subset of cases, it is broader in that it would not allow admission of a suspect's statements unless curative steps were taken even if a court determined that the *Miranda* warnings did function effectively. The Seventh Circuit seems to favor applying a hybrid of the two tests. See *United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir.2004) (reading the plurality's balancing test into Justice Kennedy's allowance for "curative steps"); see also *United States v. Carrizales–Toledo*, 454 F.3d 1142, 1151 (10th Cir.2006) ("Determining the proper application of the *Marks* rule to *Seibert* is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court.").

Indeed, the government concedes that Detective Smith initially "embarked upon a two-step interrogation procedure." Moreover, Detective Smith acknowledged that Edwards was in custody when he began his interrogation and that he knew that the questions he asked could elicit incriminating answers. In addition, he knew that Edwards had not been Mirandized. Despite his statement that he did not think that this made Edwards more likely to confess, the trial court found that "there was some police strategy at play in [Detective Smith's] mind" and noted, even before *Seibert*, that he "[didn't] think they should have done it this way." [11]

While Edwards' statement that he shot the victim in self-defense differed from his original masked-man story, it was "related to the substance" of his prewarning statement. *See Seibert, supra,* 542 U.S. at 622, 124 S.Ct. 2601. It addressed the same crime, it confirmed that he had motive, means, and opportunity to commit that crime, and it resulted from Detectives Smith and Patterson interrogating him— or as Justice Kennedy put it, "The postwarning interview resembled a cross-examination." *Id.* at 621, 124 S.Ct. 2601; *cf. Harris v. Woods,* No. 05 Civ. 5582, 2006 WL 1140888, at *12, 2006 U.S. Dist. Lexis 24608, at *118–19 (S.D.N.Y. May 1, 2006) (finding *Seibert* inapplicable because, *inter alia,* "there was no evidence in the record 'that the police used the pre-warnings statement to obtain the post-warnings statement....'"). Finally, the police took no curative measures after obtaining Edwards' first statement. *See Seibert, supra,* 542 U.S. at 622, 124 S.Ct. 2601.

As it relates to Justice Kennedy's test, the government makes two arguments that *Seibert* should not apply to these facts. First, the government maintains that Edwards' prewarning statement was not a confession. The government asserts that Detective Smith, though he initially set out on a two-step inquiry, did not ultimately "deploy the investigatory tactic ... to undermine Edwards' *Miranda* rights in a calculated manner" because he Mirandized Edwards before he actually confessed. Second, while the government does not put it in these specific terms, it argues that Edwards' "masked man" story was not inculpatory and, therefore, was not "related in substance" to the self-defense statement. These arguments are unpersuasive.

While Edwards' masked-man story may not have been a full confession, Edwards did admit that he had a motive to kill the victim (the "beef"), the means to kill the victim (the gun), and the opportunity to kill the victim (he was at the scene). Moreover, Detective Smith admitted that he Mirandized Edwards "because he had incriminated himself with the weapon." It is true that the *Seibert* court termed the statement in its case a confession and that much of the plurality's opinion, therefore, is couched in those terms. The plurality,[12] Justice Breyer,[13] and Justice Kennedy,[14] however, all clarified that the issue was not merely about complete and integrated con-

---

**11.** As the dissenters in *Seibert* noted, that case "presents the uncommonly straightforward circumstance of an officer openly admitting that the violation was intentional. But the inquiry will be complicated in other situations probably more likely to occur." *Seibert, supra,* 542 U.S. at 626, 124 S.Ct. 2601. While we do not have as direct an admission as the Supreme Court addressed in *Seibert,* Detective Smith's testimony and the content of the interrogation strongly support the trial court's

finding that there was a "strategy at play" in Smith's approach.

**12.** "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Id.* at 608, 124 S.Ct. 2601.

**13.** "Courts should exclude the 'fruits' of the initial unwarned questioning unless the fail-

fessions, but about any statements obtained through a two-step interrogation process. *See McCoy, supra,* 890 A.2d at 208 ("The Supreme Court's recent holding in *Missouri v. Seibert* . . . establishes that when police purposefully use a 'question first, Mirandize later' interrogation technique, postwarning *statements* related to prewarning *statements* must be excluded unless curative measures are taken before the postwarning statement is made.") (emphasis added).

Most importantly, applying *Seibert* solely to confessions would ignore the dictates of *Miranda,* the case that *Seibert* set out to enforce. *Id.* at 606, 124 S.Ct. 2601 ("To allow the police to achieve an 'end run' around *Miranda* . . . would encourage *Miranda* violations and diminish *Miranda's* role in protecting the privilege against self-incrimination.") (citing *State v. Seibert,* 93 S.W.3d 700, 706–07 (Mo.2002)). *Miranda* held,

> The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct

confessions and statements which amount to "admissions" of part or all of an offense . . . Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used in the prosecution.

*Miranda, supra,* 384 U.S. at 476–77, 86 S.Ct. 1602 (emphasis added).

Limiting *Seibert* to full confessions as the government urges would encourage police to withhold *Miranda* warnings at the beginning of interrogations and bring the suspect to the brink of confessing. Police could then use the prior admissions, whether inculpatory or purportedly exculpatory, to take the last small step to obtaining the confession. *See Hill v. United States,* 858 A.2d 435, 447 (D.C.2004) ("[S]trategists dedicated to draining the substance out of *Miranda* cannot accomplish by training instructions what *Dickerson*[15] held Congress could not do by statute.") (quoting *Seibert, supra,* 542 U.S. at 617, 124 S.Ct. 2601). This approach would run counter to the purpose of *Miranda* and it has been rejected by the majority of courts that have thus far applied *Seibert.*[16]

---

ure to warn is in good faith . . . I believe the plurality's approach in practice will function as a 'fruits' test." *Id.* at 617–18, 124 S.Ct. 2601. We note that Justice Breyer both joined the plurality opinion and wrote separately.

**14.** "The plurality opinion is correct to conclude that statements obtained through the use of this technique are inadmissible." *Id.* at 618, 124 S.Ct. 2601.

**15.** In *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Court declined to overrule the constitutional decision that it announced in *Miranda* and held invalid a congressional attempt to change the legal principles of Fifth Amendment enforcement. The conflicts between the *Dickerson* decision and *Elstad's* position that

*Miranda* warnings are merely prophylactic underlie the disagreements between the plurality and dissent in *Seibert. See generally* Daniel S. Nooter, Note, *Is Missouri v. Seibert Practicable?: Supreme Court Dances the "Two–Step" Around* Miranda, 42 AM. CRIM L.REV. 1093, 1098–1104 (2005); Johnathan L. Rogers, Note, *A Jurisprudence of Doubt: Missouri v. Seibert, United States v. Patane, and the Supreme Court's Continued Confusion About the Constitutional Status of* Miranda, 58 OKLA. L.REV. 295 (2005).

**16.** *See Ollie, supra,* 442 F.3d at 1137, 1141 (the appellant's post-*Miranda* confession that he had received a gun in exchange for driving two people to a liquor store was related to his pre-*Miranda* admission that he had handled the gun); *Mashburn, supra,* 406 F.3d at 309 (holding that when a "question-first" strategy

The government's second argument—that Edwards' "masked-man" statement was exculpatory and, therefore was not "related in substance" to the self-defense statement—also fails. While the "masked man" statement may have been exculpatory in nature at the time it was made, as we noted above, it was used in an incriminating fashion at trial. *See Miranda, supra,* 384 U.S. at 476–77, 86 S.Ct. 1602. It also discussed the same events as his subsequent statement; it confirmed that Edwards had motive, means, and opportunity to commit the crime. The only new detail revealed in the self-defense account was that Edwards was the shooter. While this detail is obviously critical, its addition alone does not render the two statements unrelated. *See Ollie, supra,* 442 F.3d at

is deliberately employed, "postwarning *statements* related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statements are made") (emphasis added); *Briones, supra,* 390 F.3d at 613 ("incriminating statements" should be suppressed under *Seibert*); *United States v. Aguilar,* 384 F.3d 520, 525 (8th Cir.2004) (holding that even when the scope of the pre-*Miranda* interrogation was unclear, *Seibert* applied when the other factors were met, the police conduct was intentional, and the record indicated that more than mere biographical questions were asked before the warnings were given); *United States v. Hernandez,* 341 F.Supp.2d 1030, 1035 (N.D.Ill.2004) ("incriminating statements" are sufficient to trigger *Seibert*); *Drummond v. State,* 831 N.E.2d 781, 782, 783–84 (Ind.Ct.App.2005) (admission that the appellant had "accidentally" touched a molestation victim with his penis while in a bed with her was sufficient to trigger *Seibert* and suppress further post-*Miranda* admissions); *Cooper v. State,* 163 Md.App. 70, 877 A.2d 1095, 1108–10 (Ct.Spec.App.2005) (*Seibert* applied where the unwarned statement put the suspect at the scene arguing with the victim); *State v. Brooks,* 185 S.W.3d 265, 271, 283–84 (Mo.Ct.App.2006) (suspect's pre-*Miranda* statement that she had placed a blanket over a baby's head, which was then used to obtain a confession that she had forcibly held the blanket over its head, thereby suffocating it, was an inculpatory statement that triggered *Seibert*); *State v. Wilson,* 169 S.W.3d 870, 873, 879–80 (Mo.Ct.App.2005) (statement that a suspect owned a duffle bag but that he did not know that there was marijuana inside of it was suppressed under *Seibert*); *State v. Navy,* 370 S.C. 398, 635 S.E.2d 549, 551, 556 (Ct. App.2006) (applying *Seibert* to suspect's pre-*Miranda* statement that he "may have patted the victim [infant] on his back and patted the victim on his mouth to stop him from crying").

*But see Vachet v. West,* No. 04–CV–3515, 2005 WL 740640, at *5, 2005 U.S. Dist. Lexis 5334, at *23–24 (E.D.N.Y., March 24, 2005) (finding *Seibert* inapplicable on grounds irrelevant to the case *sub judice* and, therefore, conducting only an abbreviated analysis in concluding that *Seibert* did not apply where the police had not elicited a detailed confession pre-*Miranda*); *United States v. Price,* No. 04–40035–SAC, 2004 U.S. Dist. Lexis 22220, at *13–15 (D.Kan., October 22, 2004) (holding that *Seibert* did not apply where the first round of questioning was limited to two purely detail-oriented questions that were extremely limited in scope); *Wilson v. State,* No. CR 05–788, 2006 Ark. Lexis 21, at *21 (January 12, 2006) (holding the appellant's confession after *Miranda* warnings admissible despite her pre-*Miranda* exculpatory statements to police where the appellant was not in custody at the time of the questioning, the police did not even know her true identity when they began questioning her, and her statements to police did not place her at the scene of the crime or give her a motive for the murder); *Wiggins v. State,* 280 Ga. 627, 632 S.E.2d 80, 82–83 (2006) (deciding in the context of an ineffective assistance of counsel claim that defendant's post-*Miranda* statement that he acted in self-defense was admissible where his initial pre-*Miranda* statement was exculpatory and he was not under arrest or subject to custodial interrogation at the time of his first statement); *State v. Starcher,* No.2004CA00025, 2004 WL 2955219, **4–5, 2004 Ohio App. Lexis 6521, **11–12 (Ohio Ct.App., December 20, 2004) (holding *Seibert* inapplicable where the suspect did not implicate herself in pre-*Miranda* questioning). Of these five cases, only *Starcher* is arguably in tension with our analysis, though it too can be distinguished on its facts.

1137, 1141; *United States v. Renken,* No. 02 CR 1099, 2004 WL 2005833, at *4, 2004 U.S. Dist. Lexis 17107, at *15 (N.D.Ill., August 26, 2004) (a second confession after *Miranda* warnings were given was inadmissible under *Seibert* even though the new confession was more detailed and revealed new evidence); *State v. Mattison,* No. 0403020073, 2005 WL 406342, at *3, 2005 Del.Super. Lexis 50, at *11 (Del.Super.Ct., February 4, 2005) (general admission that the appellee "did crimes to get drugs" was sufficient to bring the case under *Seibert* even though the post-*Miranda* confession was more specific and detailed). Furthermore, the two statements were linked by the detectives repeating Edwards' pre-*Miranda* statement after giving him the warnings and interrogating him on its implausibility. Had Edwards not given the first statement, it is at least possible (if not probable) that the police never would have obtained the second. For the foregoing reasons, Justice Kennedy's analysis requires that Edwards' statements be suppressed.

The statements would also be inadmissible under the *Seibert* plurality's test. The plurality maintained that whether *Miranda* warnings that are given midstream are effective—and thus the statements elicited are admissible under *Elstad* rather than prohibited under *Seibert*—is determined by a series of factors: (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and the setting of the first and second" interrogation, (4) "the continuity of police personnel," and (5) "the degree to which the interrogator's questions treated the second

round as continuous with the first." *Seibert, supra,* 542 U.S. at 615, 124 S.Ct. 2601.

We conclude that all five of the factors support the appellant's position that the statements should have been suppressed. As discussed in the context of Justice Kennedy's test, the questions and answers in the first interrogation led to a pre-*Miranda* statement that, while not a full confession, established Edwards' motive to kill the victim, his presence at the scene, and his possession of the murder weapon.[17] Edwards' initial statements not only overlapped with those from his post-*Miranda* interrogation, but the detectives used the facts in the "masked man" statement to elicit Edwards' second statement. Edwards had been in custody for several hours and no time had elapsed between the end of the pre-*Miranda* interrogation and the beginning of the post-*Miranda* questioning.

While two different detectives participated in the interrogation, they were working together. Detective Patterson took over the questioning because he knew Edwards from his duty shifts in Edwards' neighborhood. Regardless of whether this was planned from the beginning of the interrogation, in this context it constituted a form of the "Mutt and Jeff" ploy that the Supreme Court has expressed concern about in Fifth Amendment cases. *See Miranda, supra,* 384 U.S. at 452, 86 S.Ct. 1602; *see also Seibert, supra,* 542 U.S. at 616, 124 S.Ct. 2601. Moreover, both Detectives collaborated in videotaping the final statement; the two were working together toward a common goal. In this scenario, the change in personnel exacerbated the psychological impact of the de-

---

**17.** We note that the questioning in this case was not as detailed as the interrogation in *Seibert.* This fact alone, however, is not determinative. Detective Smith's questions were broad enough to prompt an incrimina-

ting response. Moreover, Smith chose not to stop the interrogation in order to issue *Miranda* warnings when he realized that Edwards was giving a detailed account of the shooting.

tectives' tactics on Edwards rather than mitigating it.

Finally, there was no significant break between interrogation sessions. Detective Smith began the second round in the same place that he had left off in the first. Thus, all five factors support Edwards' position that the statements should have been suppressed. The result is the same under the plurality's test as under Justice Kennedy's test, and the error was not harmless for the reasons we have already discussed.

In light of *Seibert*, decided subsequent to Edwards' convictions, the trial court should have suppressed Edwards' statements. Edwards' convictions are reversed, and the case remanded for a new trial.

*So ordered.*