*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 17-CF-291

JAMES N. TOLER, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-13312-16)

(Hon. Maribeth Raffinan, Trial Judge)

(Submitted October 3, 2018                    Decided December 20, 2018)

*Ian A. Williams* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Ethan L. Carroll*, and *Anwar L. Graves*, Assistant United States Attorneys, were on the brief for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and STEADMAN, *Senior Judge*.

STEADMAN, *Senior Judge*: Appealing his convictions for several firearm offenses, appellant James Toler argues that (1) all his convictions must be reversed because he was required to reveal his social security number without a prior

*Miranda*[1] warning, and (2) his convictions for possession of unregistered firearms must be reversed because the government failed to prove as an element of the offense that the firearms were not "antique" firearms. We disagree and therefore affirm the judgment.

## I.  Factual Background

On August 18, 2016, around 5:30 p.m., members of the Gun Recovery Unit (GRU) of the Metropolitan Police Department (MPD)[2] arrived at appellant's home to execute a search warrant to recover firearms. In the course of the search, the GRU officers handcuffed appellant and, prior to any *Miranda* warnings, asked him for his name, date of birth, phone number, and social security number, all of which he readily provided. During the course of the search, officers recovered two revolvers, a shotgun, two gun holsters, a speed loader, two gun cleaning kits, assorted ammunition, an ammunition case, and appellant's apartment lease. Appellant was then charged with one count of unlawful possession of a firearm in

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966), discussed further in section II.A.

[2] The GRU is a unit of the MPD charged with recovering unregistered and otherwise illegal firearms in the District of Columbia, including through the execution of search warrants.

violation of D.C. Code § 22-4503(a)(1) (2018 Supp.), three counts of possession of an unregistered firearm in violation of D.C. Code § 7-2502.01(a) (2018 Repl.), and three counts of unlawful possession of ammunition in violation of D.C. Code § 7-2506.01(a)(3) (2018 Repl.). He pled not guilty and proceeded to trial.

The three-day jury trial was bifurcated. In the first phase, appellant was convicted on all counts of possession of unregistered firearms and unlawful possession of ammunition. In the second phase, appellant was convicted of unlawful possession of a firearm, based on his prior conviction of a "crime punishable by imprisonment for a term exceeding one year." As proof of his prior conviction, the government introduced a certified copy of a U.S. Marine Corps court martial conviction record from the Department of the Navy, which stated that James Toler was convicted of a crime punishable by more than one year in prison. The government then replayed an excerpt of the video from one of the GRU officer's body-worn cameras, which had been shown in the first phase of the trial, and in which appellant stated his name and social security number, and also volunteered that he was a former Marine. The prosecutor argued to the jury that appellant was the same person as the one on the conviction record because the name and social security number that appellant recited in the video matched the

name and social security number appearing on the record as well on appellant's apartment lease.

## II.     Analysis

## A.     Admission of Biographical Information (Social Security Number)

First, appellant contends that, during the search of his home, he was subjected to custodial interrogation without a *Miranda* warning.  In particular, he flatly asserts that, had he not stated his social security number in response to an officer's question, the government would not have been able to link him to the prior conviction that served as a predicate conviction for his unlawful possession of a firearm conviction or to show that his firearms and ammunition were not registered in the District of Columbia.  He argues that, because the officer's questions – particularly as to his social security number – did not fall within the so-called "routine-booking exception" to *Miranda*, his biographical statements during the search were improperly obtained and improperly admitted at trial.

Under the doctrine first announced by the Supreme Court in *Miranda v. Arizona*, "[t]he government is constitutionally precluded by the Fifth Amendment

from using in its case-in-chief a defendant's statement, whether exculpatory or inculpatory, stemming from custodial interrogation unless the defendant has been advised of his right to remain silent." *Johnson v. United States*, 40 A.3d 1, 13 (D.C. 2012) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). We have stated that "[c]ustodial interrogation refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (citation and internal quotation marks omitted).

However, "routine questions related to the booking process . . . are not usually considered interrogation under *Miranda*, for such questions are not normally likely to elicit incriminating answers." *Id.* (citing *Thomas v. United States*, 731 A.2d 415, 424-26 (D.C. 1999) (internal quotation marks omitted)). Questions that fall under this routine booking exception to *Miranda* include "'biographical data necessary to complete booking or pretrial services[,]' such as questions regarding the name, address, height, weight, eye color, date of birth, and age of the suspect." *Id.* (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600 (1990)).

In this case, the government conceded and the trial court found that appellant was in custody when the GRU officers asked for his social security number and other information. However, the trial court, citing *Thomas v. United States*, 731 A.2d 415 (D.C. 1999), and *Jones v. United States*, 779 A.2d 277 (D.C. 2001) (en banc), found that the officers' conduct did not constitute interrogation, as the questions regarding appellant's name, phone number, and social security number were not likely to elicit incriminating information. It therefore denied the appellant's pre-trial motion to suppress these statements.

Appellant does not seriously challenge the questions relating to his name or date of birth, which have been previously countenanced in our case law. *Johnson*, 40 A.3d at 13. His focus is on the question relating to his social security number. This court has not specifically addressed whether a social security number falls within the routine booking exception. However, we have noted in the past that the MPD's booking forms request a social security number, among other information. *See, e.g., High v. United States*, 128 A.3d 1017, 1019 (D.C. 2015). Moreover, at least two federal circuit courts have held that a social security number is the type of information that would fall within the routine booking exception. *United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000) ("[I]t would be a rare case indeed in which asking an individual his name, date of birth, and Social Security number would

violate *Miranda*," though "questions about an individual's Social Security number might be likely to elicit an incriminating response where the person is charged with Social Security fraud."); *United States v. Dougall*, 919 F.2d 932, 934-35 (5th Cir. 1990) ("[T]he agents requested minimal personal data[:] name, social security number, birth date, birth place, height, weight, and address . . . . [W]e have held the sort of biographical questions – name, birth information, address, height, weight – asked here are part of the booking routine.").

In modern America, a social security number is an intrinsic element of one's identity. For children born in hospitals, it is common, at the parents' request, for the baby to be given a social security number at birth. 20 C.F.R. § 422.103(b)-(c) (2018).[3] And a child claimed as a dependent on an income tax return must have a social security number. 26 U.S.C.A § 151(e) (West 2018).[4] As with name and date of birth, a social security number is a routine means of identifying oneself. Since questioning is indubitably allowed as to these other identifiers, it is difficult

---

[3] *See also* Soc. Sec. Admin., *Social Security Numbers for Children* [Publ'n No. 05-100023] (Dec. 2017), https://www.ssa.gov/pubs/EN-05-10023.pdf; Office of the Inspector Gen., Soc. Sec. Admin., *Follow-Up of the Enumeration at Birth Program:* Audit Report [A-08-06-26003] (Apr. 2006), https://oig.ssa.gov/sites/default/files/audit/full/pdf/A-08-06-26003_0.pdf.

[4] *See also* Internal Revenue Serv., Child Tax Credit [Publ'n 972] (2017), https://www.irs.gov/publications/p972.

to see any meaningful distinction that would generally prohibit a request for a social security number.

This is not to say that a request for a social security number would never be problematic, as noted in the *Reyes* case cited above. Indeed, appellant contends that "questions that appear innocuous on their face" should fall outside the scope of the routine booking exception, even if it is standard practice to ask them, if the inquiring police officer "should know that the question is reasonably likely to elicit an incriminating response" from a suspect. In particular, appellant argues that questions that provide some proof of an element of the crime are not routine booking questions, and cites two state cases in support of this argument: *Hughes v. State*, 695 A.2d 132 (Md. 1997), and *State v. Locklear*, 531 S.E.2d 853 (N.C. Ct. App. 2000). But these cases are plainly distinguishable. In *Hughes*, the police asked an individual who had been arrested on drug charges a question about drug use, *Hughes*, 695 A.2d at 141, and in *Locklear*, the officer asked a suspect in a statutory rape case his date of birth. *Locklear*, 531 S.E.2d at 855. The questions in those cases were closely tied to elements of the crimes in question. In the case before us, a social security number is not an element, or even related to an element, of any of the offenses of which appellant was convicted. Rather, the question

relating to appellant's social security number involved, in context, nothing more than routine biographical information.[5]  We can find no *Miranda* violation here.[6]

### B. Elements of Possession of an Unregistered Firearm

Second, with respect to the convictions for possession of unregistered firearms, appellant argues that the trial court erred in ruling that the government was not required to prove beyond a reasonable doubt that the firearms were not "antique" as an element of the offense in its case-in-chief.

---

[5]  Appellant also suggests that the questioning here was impermissible under the routine booking exception because it did not take place at the time of booking. We implicitly rejected this argument in our en banc decision in *Jones*, where we held that questions asked at the scene of the arrest fell within the routine booking exception, and we also noted that this so-called exception is best viewed as an application of *Miranda* principles, under which "questions posed to a suspect regarding his identity are not reasonably likely to elicit an incriminating response." *Jones*, 779 A.2d at 282-83, 283 n.6.

[6]  We note that, even assuming arguendo that there had been a *Miranda* violation in this case, it would seem that the evidence in question would inevitably have been discovered.  *See, e.g.*, *Logan v. United States*, 147 A.3d 292 (D.C. 2016).  However, on appeal, the government does not attempt to defend the *Miranda* issue on this basis, and we therefore do not address it further.  In any event, as the government points out in its brief, nothing in the record itself supports appellant's argument that, without the social security number, the government would have been unable to prove appellant's prior criminal offense or his lack of registration for his firearms.

D.C. Code § 7-2502.01(a) provides, in relevant part, that "no person . . . in the District shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm." That chapter of the Code, in turn, defines firearm, in relevant part, as:

> [A]ny weapon, regardless of operability, which will, or is designed or redesigned, made or remade, readily converted, restored, or repaired, or is intended to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such device; or any firearm muffler or silencer; provided, that such term shall not include: (A) Antique firearms . . . .

D.C. Code § 7-2501.01(9) (2018 Repl.). And the same section defines "antique firearm," in relevant part, as "[a]ny firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898." D.C. Code § 7-2501.01(3)(A). We review the interpretation of these statutory provisions de novo. *See, e.g.*, *Peterson v. United States*, 997 A.2d 682, 683 (D.C. 2010).

The issue we must decide, then, is whether proof that the firearm is not antique is part of the government's case-in-chief or whether that obligation falls on the government only if some evidence in the case suggests that the firearm may be

antique. In resolving this issue, we find it instructive to examine the jurisprudence relating to a similar federal statutory provision, which was enacted in 1968, eight years before the passage of the District of Columbia statute, and which may well have served as a model. That federal provision defines a "firearm" as:

> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3) (2012). In turn, the statute defines "antique firearm," in relevant part, as "any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898." 18 U.S.C. § 921(a)(16)(A). *See also* 18 U.S.C.A §§ 922, 924 (West 2018) (prohibiting various acts relating to the possession and use of firearms, as defined in § 921(a)(3)).

"This court is not bound by federal courts interpreting federal law, but we generally consider applicable federal court precedent as persuasive authority when interpreting a local provision that is substantially patterned on a federal statute." *Fraternal Order of Police, Metro. Police Dep't Labor Comm. v. District of*

*Columbia*, 52 A.3d 822, 829 (D.C. 2012) (citation, brackets, and internal quotation marks omitted). As noted, D.C. Code § 7-2501.01(9) was first passed in 1976,[7] eight years after 18 U.S.C. § 921 was enacted.[8] Given the timing of its passage and the similarity in language, it is reasonable to conclude that the D.C. Code section was substantially patterned on the federal provision. The federal courts' interpretations of this provision are therefore persuasive.

Every federal circuit court, seven in all, that has interpreted § 921(a)(3) has held that the government need not prove in the first instance that a firearm is not an antique firearm. Rather, the antique nature of a firearm is an affirmative defense; only when some evidence indicates that the firearm is antique must the government then prove that it is not antique. *United States v. Mayo*, 705 F.2d 62, 74-76 (2d Cir. 1983); *United States v. Laroche*, 723 F.2d 1541, 1543 (11th Cir. 1984); *United States v. Smith*, 981 F.2d 887, 891-92 (6th Cir. 1992); *United States v. Washington*, 17 F.3d 230, 232 (8th Cir. 1994); *United States v. Lawrence*, 349 F.3d 109, 122-23 (3d Cir. 2003); *United States v. Basnett*, 735 F.3d 1255, 1257-58 (10th Cir. 2013);

---

[7] D.C. Law 1-85, § 101(9) (1976).

[8] Pub. L. No. 90-351, Ch. 44, § 921(3), (18)(b)(1), 82 Stat. 227-28 (1968).

*United States v. Royal*, 731 F.3d 333, 338 (4th Cir. 2013).[9] We think these cases persuasive.[10]

Moreover, it is telling that our particular statute goes on to list, in addition to "antique firearms," four other exceptions to the definition of "firearm" for a total of five:

>   (A) Antique firearms; or
>   (B) Destructive devices; [or]

---

[9] One additional federal circuit court has acknowledged this unanimity in an unpublished opinion. *United States v. Harris*, 627 F. App'x 379, 380 (5th Cir. 2015). And we have articulated the same principle in a similar context. *Bsharah v. United States*, 646 A.2d 993, 998 (D.C. 1994) (interpreting the licensed dealer exception to the crime of carrying a pistol without a license under D.C. law, and finding that, "[w]hen a defendant relies on a statutory exception as an affirmative defense to a criminal charge, the burden is on the defendant to bring himself or herself within the exception." (citing *Middleton v. United States*, 305 A.2d 259, 261 (D.C. 1973)).

[10] This court analyzes self-defense under a similar framework: the government must prove the absence of self-defense only if some evidence in the case suggests that self-defense may be a valid defense. *See, e.g.*, *Hernandez v. United States*, 853 A.2d 202, 205 (D.C. 2004) (a defendant is entitled to a jury instruction on self-defense if there is "some evidence" of it); *Parker v. United States*, 155 A.3d 835, 842 (D.C. 2017) (when a defendant presents evidence that he acted in self-defense, the government must prove beyond a reasonable doubt that he did not); *Richardson v. United States*, 98 A.3d 178, 187 n.11 (D.C. 2014) (when a defendant has offered sufficient evidence to justify a jury instruction on self-defense, the burden shifts to the government to disprove defendant's self-defense claim beyond a reasonable doubt).

(C) Any device used exclusively for line throwing, signaling, or safety, and required or recommended by the Coast Guard or Interstate Commerce Commission; [or]

(D) Any device used exclusively for firing explosive rivets, stud cartridges, or similar industrial ammunition and incapable for use as a weapon; or

(E) A stun gun.

D.C. Code § 7-2501.01(9)(A)-(E). It borders on the absurd to assert that the government, as part of its case-in-chief, must disprove every one of these exceptions, and no reason is readily apparent why antique firearms should be treated differently from the others.

In the case before us, there was no evidence that appellant's firearms were antique firearms. None emerged from the government's case, and appellant did not proffer any in support of such a defense.[11] He merely argued that the government had failed to prove the non-antique nature of the firearms, which he asserted was an element of the offense. Under these circumstances, we can find no error in the trial court's rejection of appellant's argument.

---

[11] At trial, appellant's counsel asked one of the police officers whether he knew the age of the firearms, and he stated that he did not. The government then attempted to ask another officer when the firearms were manufactured, but appellant counsel's objected because the officer was not a qualified expert on the age of firearms; the trial court permitted questioning only as to the officer's personal experience, and the government asked no further questions on this point. This was the extent to which the issue was addressed at trial, and thus there was no actual evidence of the date of manufacture.

### III.    Conclusion

Accordingly, the judgment appealed from must be and hereby is

*Affirmed.*