*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-78

AVERY D. KINNEY, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF3-015817)

(Hon. Ronna Lee Beck, Trial Judge)

(Argued February 27, 2020     Decided December 29, 2022)

*Lee R. Goebes*, Public Defender Service, with whom *Samia Fam*, *Alice Wang*, and *Joshua Deahl*, Public Defender Service, were on the brief, for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Melissa Jackson*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, *Associate Judge*, and FERREN and GLICKMAN,[*] *Senior Judges*.

---

 * Judge Glickman was an Associate Judge of the court at the time of argument. He began his service as a senior judge on December 21, 2022.

BECKWITH, *Associate Judge*: A jury found Avery Kinney guilty of two counts of armed robbery,[1] two counts of possession of a firearm during a crime of violence (PFCV),[2] and one count of fleeing from a law enforcement officer.[3] On appeal, Mr. Kinney argues that the trial court erred in failing to suppress statements he made during an unwarned custodial interrogation and in denying his severance motion. Because we agree that admitting the statements ran afoul of *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, we reverse.

## I.

The charges against Mr. Kinney stemmed from two incidents involving alleged robberies of transgender women. As to the first incident, Elise Prather testified that in the pre-dawn hours of September 9, 2016, she was standing on the corner of North Capitol Street and K Street—an area known for prostitution, as well as a gathering place for trans women—wearing a leotard. A car pulled up to the corner, and Ms. Prather's niece[4] remarked that it looked like the driver was interested in Ms. Prather. Ms. Prather asked him for a ride to meet her aunt a few blocks up

---

[1] D.C. Code §§ 22-2801, -4502.

[2] D.C. Code § 22-4504.

[3] D.C. Code § 50-2201.05b(b)(2).

[4] Ms. Prather was referring to her "chosen" or "trans" family.

the street. She testified that while she had engaged in solicitation in the past, she was not soliciting or trying to solicit on the night in question. The driver, who identified himself as "Jo Jo," flirted with Ms. Prather during the drive and continued driving past where Ms. Prather had asked to go. He first turned into an alley, and when Ms. Prather said it might look suspicious for them to be there, he drove to the end of the block and parked there. They were sitting and talking, and then he told her to leave her purse in the car. She turned around and saw a gun pointed at her head. When she tried to get out of the car, the driver snatched her purse, breaking her acrylic nails, and then sped off. She went back to the K Street area and attempted to wave someone down, eventually borrowing a phone and calling 911.[5]

Christian McIntosh, also a trans woman, testified to events that occurred two nights later. She was on K Street with a friend, hoping to meet men, when a car pulled up and the driver called Ms. McIntosh over, asking if she "wanted to see his dick." He told her to get in the car because the police were following, and, because she thought he was cute, she did. Ms. McIntosh asked him to take her back to her house. She did not mention anything about payment, but he told her he had money and showed her some cash. They drove into a residential area, where the driver told

---

[5] Ms. Prather also testified that she saw a car that weekend that reminded her of the one she had gotten into, but she did not get the license plate number or see the driver.

Ms. McIntosh to look out the window and then to "[d]rop [her] shit" on the floor. When she turned to him, he had a gun in her face. He told her to get out of the car; she did, and he drove off the way they had come in. She chased after the car on foot until she reached a 7-Eleven where a man called 911 for her. Officers responded, and Ms. McIntosh used "Find My iPhone" on an officer's phone—it "ping[ed]" near 1st and K Streets NE.

A police dispatcher announced a "lookout" for a silver Nissan in that area. An officer soon saw a car matching the description and started following it, with lights and siren activated. The car pulled over briefly but then took off "at a high rate of speed"—the officer chased the car but lost it. The officer had gotten the license plate number, however, and police used it to connect the vehicle to its registered owner, Gerald Hardy, on Broadbill Court in Waldorf, Maryland. Detective Carol Queen presented the complainants with a photo array that included Mr. Hardy, but neither Ms. Prather nor Ms. McIntosh identified him. Nonetheless, officers seized and searched the car and found an identification card and debit card in Mr. Kinney's name, a SmarTrip metro card officers later connected to Ms. McIntosh, and a BB gun. The next day, Detective Queen presented Ms. Prather and Ms. McIntosh with a second photo array. Each complainant indicated that Mr. Kinney was her assailant.

The police executed a search warrant at Mr. Hardy's house, where they found

mail and an ID in Mr. Kinney's name, as well as a pair of pants matching Ms. McIntosh's description of what her assailant was wearing—jeans with creases on the front. Mr. Hardy told officers that Mr. Kinney stayed at his house sometimes; he testified at trial that they were in a relationship that only a couple members of Mr. Hardy's family knew about. A few days later, officers searched Mr. Kinney's own house on Corcoran Street in the District, and that same day Mr. Kinney went to the station of his own accord and submitted to questioning.

After Mr. Kinney had been waiting in an interrogation room for about 30 minutes, Detective Queen told him he was under arrest. He was handcuffed to a chair, told—in response to his questions—that he was locked up for robbery but would have to wait for more information from Detective Queen, and left to wait there for another half hour.

When Detective Queen returned, she said she needed some biographical information from Mr. Kinney. She talked to him for 15 minutes before giving him *Miranda* warnings. She began by asking Mr. Kinney's name, date of birth, and address. When Mr. Kinney provided his Corcoran Street address, Detective Queen asked about the address on Broadbill Court in Maryland, eliciting statements showing Mr. Kinney's connection to the owner of the car used in the robberies. She asked, for example, whether Mr. Kinney sometimes stayed at the Waldorf address

and whether it was "a second residence where [he] escape[d]" when he and his daughter's mother "get into it." She asked how long Mr. Kinney had been friends with Mr. Hardy and said that it was "nice" that he had a "good friend" who "looks out for [him]" and "a safe place where [he] can lay [his] head." In addition to asking questions about how much backup time Mr. Kinney had from a prior offense, Detective Queen asked a number of questions about Mr. Kinney's daughter—where she was staying, for example, and whether he knew "where drawers at, like paper, drawer, mail, stuff like that" at that address. Detective Queen also asked about Mr. Kinney's job and work schedule—"you weren't working seven days a week though right?"—the nature and location of his work, how long he had been with his employer, and whether his employer was "like a contractor." A number of Detective Queen's questions prompted descriptions of difficult circumstances demonstrating a potential motive for the robberies. These included statements about Mr. Kinney's roach- and mice-infested home, the shootings in his neighborhood, his interest in getting out of the District and moving to Waldorf, the number of side jobs he worked, and his need to take care of his daughter.

Also during this conversation, Detective Queen told Mr. Kinney to try "not to put [him]self in a position where [he's] behind bars." At that, Mr. Kinney asked why he was "down [there]" and said he was "totally confused." Detective Queen responded, "I understand, let's talk," to which Mr. Kinney responded that he was

"confused and nervous . . . because he [felt] like someone [was] framing [him] or something." Detective Queen responded that she did not know about anybody framing Mr. Kinney and that she only knew what he told her.

The two talked for a few more minutes before Detective Queen Mirandized Mr. Kinney, who waived his rights. Detective Queen recounted what had been reported about the two robberies and told Mr. Kinney that he had been identified as the driver. Mr. Kinney again said that he was being framed. He told Detective Queen that on the dates in question, he had been "hit[ting] that synthetic stuff" and his friend had taken the car while he was passed out. He said his text messages would verify that, as he had texted Mr. Hardy that someone had taken the car. Mr. Kinney also insisted that he had a "big old scar" on his face at the time, which the women would have mentioned if it had been him in the car. He told Detective Queen that he bought and resold old phones and that the BB gun he knew had been found in the car was one that he had taken from his baby mama's 18-year-old brother who had been "going around acting like it was a real gun." Mr. Kinney consented to a search of his phone, which showed searches on September 9 for pawnshops and on September 11 for how to jailbreak an iPhone 6 Plus.

Before trial, Mr. Kinney moved to suppress the statements he made at the stationhouse. The government initially represented that it would not use any of the

statements in its case in chief. The week before trial, however, it filed a supplemental opposition to the suppression motion arguing that the statements made after Mr. Kinney was Mirandized were admissible. At a suppression hearing, Detective Queen testified that she spent time "chatting" with Mr. Kinney before reading him his rights "to build a rapport . . . with him," "obtain biographical information for the lockup paperwork," and "get comfortable" and "calm him down." She testified that she asked about Mr. Hardy's address to confirm it for the paperwork. While she also knew that tying him to the address would tie him to the evidence that had been found there, she said that was not her mindset in asking the questions. The trial court ruled that the postwarning statements were admissible, and the government played that portion of the interview for the jury at trial.

## II.

Mr. Kinney argues that under *Missouri v. Seibert*, 542 U.S. 600 (2004), his statements should have been suppressed as the product of a two-step interrogation designed to undermine the *Miranda* warnings he received midway through a stationhouse interrogation. In *Seibert*, a fragmented Supreme Court addressed "[t]he technique of interrogating in successive[] warned and unwarned phases." 524 U.S. at 609 (plurality opinion). Five Justices agreed that some such "two-step interrogations yield inadmissible statements even if the statements are voluntary in

fact." *Ford v. United States*, 931 A.2d 1045, 1051 (D.C. 2007). While the plurality would focus on whether the warnings could function effectively in the circumstances, Justice Kennedy's test asked whether officers *deliberately* employed a two-step interrogation strategy to undermine the *Miranda* warnings. *Id.* This court has adopted that latter test as the controlling one under *Seibert*. *See id.* at 1051-52.

**A.**

When addressing whether a deliberate two-step interrogation within the meaning of *Seibert* occurred, we first ask whether the prewarning phase constituted custodial interrogation within the meaning of *Miranda*. *See In re D.W.*, 989 A.2d 196, 205 (D.C. 2010) ("[A] *Seibert* violation cannot occur unless the first interrogation was conducted in violation of *Miranda*, i.e., while the defendant was in custody without having been advised of his *Miranda* rights.").

Here, the government does not contest that Mr. Kinney was in custody before he received *Miranda* warnings. The operative question is thus whether Mr. Kinney was subject to interrogation. "Custodial interrogation refers 'not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that police should know are reasonably likely to elicit an incriminating response from the subject.'" *Johnson v. United States*, 40 A.3d 1, 13 (D.C. 2012) (quoting *Rhode Island v. Innis*, 446 U.S.

291, 301 (1980)). Whether there was custodial interrogation is a question of law we review de novo. *Id.* at 12.

The government argues that Detective Queen's prewarning questions to Mr. Kinney were "routine booking questions" or were otherwise unlikely to elicit an incriminating response. *See id.* at 13 (noting that "routine questions related to the booking process," such as "questions regarding the name, address, height, weight, eye color, date of birth, and age of the suspect" are "not usually considered 'interrogation' under *Miranda*, for such questions are not normally likely to elicit incriminating answers"). Although some of Detective Queen's questions may fall within the routine booking exception, that cannot be said of the entire prewarning conversation.

"[Q]uestions [designed] to secure the biographical data necessary to complete booking or pretrial services" are "exempt[] from *Miranda*'s coverage," but that does not mean that "any question asked during the booking process falls within that exception." *Thomas v. United States*, 731 A.2d 415, 421, 423 (D.C. 1999) (second alteration in original) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 602 n.14 (1990) (plurality opinion)). "[E]ven if a question appears innocuous on its face, . . . it may be beyond the scope of the routine booking exception if the officer knows or should know that the question is reasonably likely to elicit an incriminating

response." *Id.* at 423 (quoting *Hughes v. State*, 695 A.2d 132, 140 (Md. 1997)). Detective Queen testified that she knew that tying Mr. Kinney to Mr. Hardy and his house would connect Mr. Kinney to evidence in the case. Even though she testified that connecting him to the evidence was not her purpose in asking those questions, that is not the standard for determining whether an officer's question constitutes custodial interrogation. What matters is that she knew her questions likely would elicit an incriminating response.[6] *See State v. Kazanas*, 375 P.3d 1261, 1264 (Haw. 2016) (finding that an officer's "apparent effort to make small talk and calm [appellant] down" by "ask[ing] him how his Halloween went" constituted custodial interrogation because even though the officer "testified that she did not intend her small talk to provoke an incriminating response," she should have known that it was reasonably likely that it would because she already "knew how [his] Halloween

---

[6] This case is thus distinguishable from *Toler v. United States*, 198 A.3d 767 (D.C. 2018), on which the government relies. In *Toler*, officers asked the suspect for his social security number—information that, the appellant contended, allowed the government to determine that his firearm was not registered in the District and to link him to a prior offense that served as a predicate. *Id.* at 770. The court rejected the appellant's argument that the question fell outside the routine booking exception because the social security number was not "even related to an element[] of any of the offenses of which appellant was convicted." *Id.* at 771. Here, the detective did not seek standard information that turned out to be incidentally (and indirectly) incriminating but knowingly connected Mr. Kinney directly to evidence in the case. *See Thomas*, 731 A.2d at 426 (discussing how questions about an appellant's name can fall outside routine booking exception).

went").

Moreover, when Mr. Kinney said during this questioning that he was "confused," Detective Queen responded, "I understand, let's talk." Mr. Kinney explained that he felt "like someone [was] framing [him] or something," and Detective Queen—still without administering warnings—told him,

> I don't know, I only know what you tell me, if somebody is framing you, I only know what you tell me. Because I have one side of the story. I'll be honest I'm a fair person, I have been doing this job almost 30 years, I'm a very fair person, I give everybody to come to that door and an opportunity to say what happened [sic].

"Asking a suspect if he wants 'to tell his side of the story' . . . tend[s] to elicit a statement" and so "is interrogation." *Martinez v. United States*, 566 A.2d 1049, 1053 (D.C. 1989); *see also Innis*, 446 U.S. at 300-01 (interrogation includes not only express questioning but also its functional equivalent); *Phillips v. State*, 40 A.3d 25, 32-33 (Md. Ct. App. 2012) (finding that it is likely to elicit an incriminating response when "police, having first established a rapport with a suspect who has been arrested . . . tell the suspect that they want to hear his . . . side of the story").

Engaging in casual conversation with a suspect and confirming where he lives does not necessarily run afoul of *Miranda* when it is not likely to elicit an incriminating response. But urging a suspect to tell his side of the story is not casual

conversation, and questions an officer knows will connect the suspect to evidence in the case—even if they might otherwise be typical booking questions[7]—require *Miranda* warnings. *See Thomas*, 731 A.2d at 423-26; *Toler v. United States*, 198 A.3d 767, 771 (D.C. 2018). Mr. Kinney was subjected to unwarned custodial interrogation.

**B.**

We next address whether Detective Queen "made a 'deliberate' choice to flout or circumvent *Miranda* by using" a two-step "question-first" interrogation strategy. *Ford*, 931 A.2d at 1051-52. The government bears the burden to show that the police did not deliberately employ a two-step interrogation technique. *Edwards v. United States*, 923 A.2d 840, 848 (D.C. 2007).[8]

---

[7] It is not clear whether confirming all addresses where a suspect spends time is even a part of the standard booking process. *Cf. Toler*, 198 A.3d at 771 (noting, in considering whether asking for a social security number fell within the routine booking exception, that the police department's booking forms specifically request that information). Mr. Kinney had already provided an address, which Detective Queen confirmed quickly at the beginning of the conversation. *See Thomas*, 731 A.2d at 426 (distinguishing cases in which suspects were repeatedly questioned about their identity from cases in which they were asked their names for the first time). Moreover, Detective Queen testified that she already knew that Mr. Kinney received mail at Mr. Hardy's address.

[8] We have not addressed the quantum of proof required, but we may assume for present purposes that the government must make this showing by a preponderance of the evidence. *See United States v. Capers*, 627 F.3d 470, 480 (2d

The question of deliberateness under *Seibert* is a factual one, and so we review a trial court's deliberateness finding for clear error. *Ford*, 913 A.2d at 1052-53. Here, the trial court did not directly address deliberateness. In ruling on the suppression motion, it "credit[ed] [Detective Queen's] statement that . . . she was not trying to trick [Mr. Kinney] into connecting himself to the Maryland address." The government urges us to treat this as a finding that there was no deliberate two-step. But whether Detective Queen was trying to *trick* Mr. Kinney does not resolve whether the government has shown that Detective Queen did not withhold the warning "to obscure both the practical and legal significance of the admonition when finally given." *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring).

We have long recognized that it is "obvious[ly] improp[er]" for the police to "deliberate[ly] fail[] . . . to inform a criminal suspect *promptly* of his rights under *Miranda*." *United States v. Brown*, 737 A.2d 1016, 1021 n.8 (D.C. 1999) (quoting *Davis v. United States*, 724 A.2d 1163, 1170 (D.C. 1998)). Once an "officer has detained a suspect and subject[ed] him to interrogation, . . . there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed." *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006) (emphasis omitted); *accord United States v. Capers*, 627 F.3d 470, 480-81 (2d Cir.

---

Cir. 2010) (holding that the preponderance standard applies and finding it unmet).

2010). Thus, "the most plausible reason" for intentionally delaying a *Miranda* warning "is an illegitimate one, which is the interrogator's desire to weaken the warning's effectiveness." *Williams*, 435 F.3d at 1159 (emphasis omitted); *Capers*, 627 F.3d at 480-81. The government has not argued that the delay in Mirandizing Mr. Kinney was unintentional—that, for example, Detective Queen forgot, or that she reasonably thought he was not in custody, *cf., e.g.*, *Ford*, 931 A.2d at 1053.[9] The government thus must counter a presumption of illegitimacy and show that the delay was not intended to undermine the effectiveness of the warnings.

Detective Queen's stated reason for delaying the *Miranda* warnings is consistent with an intent to undermine the warnings.[10] She testified at the

---

[9] Nor has the government argued that the questioning was "for a purpose distinct from criminal prosecution," *cf. United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 63 (D.D.C. 2017), a category of cases we need not address today.

[10] The officer's account is not, of course, the only factor to be considered in assessing deliberateness. *See Capers*, 627 F.3d at 482 ("Justice Kennedy's concurrence in *Seibert* does not advocate a test whereby a deliberate two-step interrogation will be found only when a law enforcement officer admits to executing such a strategy."); *see also Seibert*, 542 U.S. at 616 n.6 (plurality opinion) (noting that "the intent of the officer will rarely be as candidly admitted as it was here"). This court has considered other evidence in applying *Seibert* in past cases, and the analysis should continue to account for the totality of the circumstances. *See, e.g.*, *Ford*, 931 A.2d at 1053-54 (considering whether there was evidence of a practice or "formal or informal" policy of deliberately withholding *Miranda* warnings, whether the officer had been trained in question-first techniques, and whether officer's subjective view that suspect was not in custody was reasonable); *Edwards*, 923 A.2d at 849-51, 849 n.11 (considering whether officers knew suspect was in custody and

suppression hearing that she engaged in over 15 minutes of conversation with Mr. Kinney before Mirandizing him not only to "obtain biographical information for the lockup paperwork" but also to "build a rapport" with Mr. Kinney—to "get [him] comfortable" and "calm him down."  She does not claim that the entire unwarned conversation constituted "routine booking questions."[11]  And building rapport by urging a suspect to tell his side of the story and asking questions that are reasonably likely to elicit incriminating responses—before giving *Miranda* warnings—is not a legitimate investigative tactic but one that directly undermines the effect of the *Miranda* warning once given.  *See Seibert*, 542 U.S. at 620 (Kennedy, J., concurring); *Miranda*, 384 U.S. at 469 (explaining that a key function of the warning is "to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest"); *see also* Yale Kamisar, *On the Fortieth Anniversary of the* Miranda *Case: Why We Needed It, How We Got It—And What Happened to It*, 5 Ohio St. J. Crim. L. 163, 186-88 (2007) (arguing that interrogation strategies designed to condition

---

whether officers linked pre- and post-warning statements); *Hairston v. United States*, 905 A.2d 765, 780 (D.C. 2006) (considering that the unwarned conversation did not in fact result in any statement from the appellant linking him to the crime).

[11] Even crediting Detective Queen's testimony that she asked Mr. Kinney about Mr. Hardy's address to confirm it "for the lockup paperwork" rather than to build a case against Mr. Kinney, she still asked other questions about, for example, his relationship with Mr. Hardy, that she knew could elicit incriminating responses.

the subject to waive his rights are necessarily irreconcilable with *Miranda*).

In *Hairston v. United States*, 905 A.2d 765 (D.C. 2006), officers employed a "just listen" technique before Mirandizing Mr. Hairston, recounting the facts of the crime and telling Mr. Hairston not to speak. *Id.* at 771. The court assumed without deciding that this "was the functional equivalent of interrogation" and noted that if it was interrogation, "it plainly was a '*deliberate* [use of the] two-step['] strategy addressed in *Seibert*." *Id.* at 780 & n.16 (first alteration in original). That is no less true here. Because Mr. Hairston had not made any statement linking himself to the murder, however, the court determined that "the administration of the *Miranda* warnings in phase two . . . still could achieve the objective of *Miranda*" in that case. *Id.* at 782. Here, in contrast, Mr. Kinney made incriminating statements within the meaning of *Miranda* before he was advised of his rights. *See Edwards*, 923 A.2d at 850 ("[N]o distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used in the prosecution." (emphasis omitted) (quoting *Miranda*, 384 U.S. at 476-77)).

With his prewarning statements in this case, Mr. Kinney locked himself into an account of what happened, and when he started doing so, Detective Queen did not "stop the interrogation in order to issue *Miranda* warnings" but expressed

interest in Mr. Kinney's story and pressed him to talk about it. *See id.* at 852 n.17. The government suggests that this case nevertheless does not fall within *Seibert* because Detective Queen did not directly confront Mr. Kinney with these unwarned statements after *Mirandizing* him. But *Seibert* does not set forth such a requirement.[12] On these facts, Detective Queen did not need to confront Mr. Kinney with his prewarning statements directly, because the connection was implicit. After Mirandizing Mr. Kinney, Detective Queen told him that he could give her his take on the robbery allegations, but Mr. Kinney had already given his take: he was framed.

The government contended at oral argument that if we do not treat the trial court's statements about trickery as a deliberateness finding, we should remand for the trial court to make that determination in the first instance. But because the government has not produced evidence sufficient to dispel the conclusion that the officers deliberately employed a two-step interrogation tactic to undermine *Miranda*,

---

[12] *Seibert* itself involved an officer "confront[ing] the defendant with her inadmissible prewarning statements," but Justice Kennedy did not describe this as dispositive. 542 U.S. at 621 (Kennedy, J., concurring). Suppression was required because "[t]he *Miranda* warning was withheld to obscure both the practical and legal significance of the admonition when finally given." *Id.* at 620. The fact that the suspect was directly confronted with her prewarning statements "show[ed] the temptations for abuse inherent in the two-step technique" and "[f]urther" supported suppression. *Id.* at 621.

no remand is necessary. *See Mingle v. Oak St. Apartments Ltd.*, 249 A.3d 413, 415-16 (D.C. 2021) (under clear error review, the evidence "must not be so slight or insufficient as to fail to rationally support a finding upon the appropriate standard of proof"); *Capers*, 627 F.3d at 481 (reversing trial court's finding that there was no deliberate two-step without remanding for the trial court to address the proper question, because "the government ha[d] not produced sufficient . . . evidence to meet its burden to dispel a conclusion that [the officer's] conduct amounted to a deliberate 'question first' interrogation tactic designed to undermine [the defendant's] exercise of his *Miranda* rights"); *Reyes v. Lewis*, 833 F.3d 1001, 1030-31 (9th Cir. 2016) (concluding that under the totality of the circumstances, the "officers deliberately employed the two-step interrogation technique condemned in *Seibert*, and that the magistrate judge and the district court clearly erred in concluding otherwise"); *cf. United States v. Brown*, 700 A.2d 760, 762 (D.C. 1997) (declining to remand where the trial court had made no finding on factual question of suggestivity—which would determine the admissibility of an identification— because there could "be only one result" as a matter of law and because "judicial economy and fairness to the parties" thus counseled against prolonging the proceedings).

The parties dispute whether we must separately decide whether the *Miranda* warnings could function effectively after determining that the officer employed a

deliberate two-step strategy.[13] In *Seibert*, the plurality would have evaluated effectiveness under a multifactor inquiry from the suspect's perspective. *See* 542 U.S. at 615-16 (plurality opinion). But the plurality's test would have applied to two-step interrogations whether or not they were deliberate. *See id.* If there has been a finding of deliberateness—meaning that the interrogation technique was calculated to undermine the *Miranda* warnings—it is safe to assume the warnings would be ineffective to a reasonable person absent some clear indication to the contrary.[14] *See Williams*, 435 F.3d at 1158 ("[W]here law enforcement officers *deliberately* employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a *reasonable person* in the suspect's shoes of his rights, the trial court

---

[13] Although we considered effectiveness in *Edwards* and *Hairston*, these cases predated our decision in *Ford* delineating *Seibert*'s holding. *Ford* quoted a Ninth Circuit opinion describing the narrowest test—and thus *Seibert*'s holding—as "exclud[ing] confessions made after a deliberate, *objectively ineffective* mid-stream warning." 931 A.2d at 1052 (emphasis added) (quoting *Williams*, 435 F.3d at 1158). Because the *Ford* court upheld the trial court's finding of no deliberateness, it did not have the occasion to determine whether courts in this jurisdiction must conduct a separate effectiveness inquiry once they have found that officers deliberately employed a two-step process to undermine the *Miranda* warnings. *See id.* at 1052-54.

[14] Accordingly, Justice Kennedy's *Seibert* concurrence, having required deliberateness, does not engage in a comprehensive inquiry into effectiveness but asks only whether curative measures were taken. 542 U.S. at 621-22 (Kennedy, J., concurring).

should suppress the confession."); *United States v. Ray*, 803 F.3d 244, 267-68 (6th Cir. 2015) (reading the *Seibert* plurality and Justice Kennedy's *Seibert* concurrence as "recogniz[ing] that *Miranda* warnings usually will be ineffective in a successive interrogation that is 'close in time and similar in content' to the pre-*Miranda* admission" (quoting *Seibert*, 542 U.S. at 613 (plurality opinion))).

The government does not contend that any "curative measures [were] taken before the postwarning statement[s] [were] made" here. *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). And while other factors—such as a "separation[] of time and circumstance," *Williams*, 435 F.3d at 1158, or the fact that the suspect made no unwarned statements related to the crime, *see Hairston*, 905 A.2d 781-82—could perhaps mean that *Miranda* warnings were effective notwithstanding the officer's intent to undermine them, such circumstances were absent here. Detective Queen apprised Mr. Kinney of his *Miranda* rights in the middle of a continuous stream of custodial interrogation, after he had given an account of the crime and without any qualifier that his prior statements could not be used against him.

Because the deliberate two-step strategy was used and no curative measures were taken, "postwarning statements . . . related to the substance of prewarning statements must be excluded." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). The government recognizes that Mr. Kinney stated both before and after the

warnings that he was framed, but it contends that these do not qualify as "related" statements under *Seibert* because Mr. Kinney did not elaborate on this theory in the prewarning account. That takes too narrow a view of relatedness. *See Edwards*, 923 A.2d at 849, 851-52 (concluding that, where appellant gave postwarning statement that "addressed the same crime" as the prewarning statement, the fact that the postwarning statement added a "critical" detail—that appellant himself was the shooter—did "not render the two statements unrelated" and citing cases in which the post-*Miranda* confession was more specific and detailed than any prewarning statement).[15] Mr. Kinney's unwarned statements not only provided the same account of the crime but also identified a possible motive (economic hardships) and a means (ready access to the car used to commit the alleged robberies). "Had [he] not given the first statement, it is at least possible (if not probable) that the police never would have obtained the second." *Id.* at 852. Accordingly, Mr. Kinney's statements should have been suppressed.

---

[15] In *Edwards*, the question with respect to relatedness involved a statement that provided a wholly different account of the crime. *See* 923 A.2d at 851. In the unwarned portion of the interview, the appellant said someone else—a "masked man"—committed the shooting; he repeated this story after being Mirandized before changing his story to self-defense. *Id.* at 842-43. The government conceded error in the admission of the "masked man" story that provided—as in this case—the same account of the crime. *Id.* at 846.

### III.

Because the admission of the postwarning statements was an error of constitutional dimension, we must reverse Mr. Kinney's convictions unless the government shows that the error was harmless beyond a reasonable doubt. *Edwards*, 923 A.2d at 847; *Chapman v. California*, 386 U.S. 18, 24 (1967).[16] The government argues that it has met its burden because there is overwhelming evidence of Mr. Kinney's guilt. We must decide, however, "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Smith v. United States*, 529 A.2d 312, 317 (D.C. 1987) (quoting *Chapman*, 386 U.S. at 23). "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." *Chapman*, 386 U.S.

---

[16] Mr. Kinney asks that his convictions be reversed without distinguishing between them, and the government has made no argument that the conviction for fleeing from a law enforcement officer can stand even if the others cannot. As to that charge, however, this is "the rare circumstance in which harmlessness is obvious" such that we can "find an error harmless notwithstanding the government's failure to make a timely claim of harmlessness." *Kelly v. United States*, 281 A.3d 610, 617 (D.C. 2022) (quoting *Randolph v. United States*, 882 A.2d 210, 226 (D.C. 2005)). In closing, the defense admitted that four of the five elements of that offense were satisfied (the defense theory was that Mr. Kinney was fleeing not because he was guilty of armed robbery but because he was guilty of solicitation or was hiding his double life) but argued that the government had not met its burden to show that Mr. Kinney was driving "recklessly" while fleeing. Mr. Kinney's statements had no bearing on this. Accordingly, we affirm the conviction for fleeing from a law enforcement officer; the harm discussion that follows applies only to the armed robbery and PFCV convictions.

at 23-24.

The admission of Mr. Kinney's postwarning statement undermined the defense theory that the complainants' allegations stemmed from Mr. Kinney having underpaid for a sexual transaction. As in *Edwards*, his "ostensibly 'exculpatory'" postwarning statements "bec[a]me a key aspect of the government's [case]." 923 A.2d at 847. The government referred to these statements in its closing argument. Indeed, it argued that Mr. Kinney's "own words" at the stationhouse were a reason the jury should believe the government's theory:

> [O]ver and over again he tells you the story. Wasn't me. Wasn't me. Wasn't me. . . . He was very specific and detailed. He didn't just say it once and then say never mind, I'm done. He said it over and over and over again and he piled on detail after detail after detail . . . . He doubled down over and over and over and over and over again. He had every opportunity to step back and just say oh, look, I'll tell you what happened or just say nothing. Could have just done that, but he chose to speak, and when he chooses to speak, you're allowed to look at it critically. And you should because it doesn't make any sense.

The government emphasized Mr. Kinney's "decision to go before the police and tell them this made up, elaborate story . . . that he doubled down on time and time again" as the final reason the jury should find him guilty. *See United States v. DeLoach*, 504 F.2d 185, 191 (D.C. Cir. 1974) (noting that the final minutes of argument "probably have the greatest influence on the jury").

After the defense put its theory before the jury in closing—that the women "were unable to get full payment [from Mr. Kinney] so they sought full payback"— the government circled back to Mr. Kinney's statements in its rebuttal. If this were really a case about prostitution, it argued, "Why not just say it? Why not just tell what happened then if the truth is that you didn't rob these women and it was an argument?" "A prosecutor's stress [on] . . . particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial." *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004).

The government now contends on appeal that because defense counsel offered a plausible explanation for Mr. Kinney's contradictory statements—that he was leading a double life and did not want it to get out that he was picking up transgender women—it is "not likely the jury assigned much significance to [the stationhouse statements]." But the defense's attempt to cast an erroneously admitted statement as a less incriminating one cannot stand in for a harmlessness showing, particularly where the prosecutor took pains to undermine this account of the statements.[17]

The defense also offered an account for what the government contended was

---

[17] The prosecutor argued in rebuttal that Mr. Kinney did not know Detective Queen and that his secret was not such a secret, as members of Mr. Hardy's family knew about the men's relationship and Mr. Kinney's photo was on Backpage.com.

overwhelming physical evidence. Mr. Kinney's theory was that, yes, the two women got into the car with him, explaining their ability to identify him and his clothing. Mr. Kinney fled because he was illegally soliciting prostitutes and was attempting to hide his "double life." As to the SmarTrip card, Ms. McIntosh could have dropped it in the car; there was no evidence that Mr. Kinney ever used it. And as to the gun, the defense argued that the complainants' description was generic enough to cover most guns and "kept changing." That leaves the phone ping and the searches for pawnshops and how to "jailbreak" an iPhone 6 Plus. The defense argued that because Mr. Kinney had previously made similar searches, the jury should not read much into the searches the government highlighted. As to the ping, Mr. Kinney points out that the government acknowledged that it was not clear exactly what the ping meant in terms of its location at a particular time. And defense counsel argued in closing that the ping was not where police saw Mr. Kinney's car and not in a location where it would have made sense for Mr. Kinney to go.

While the circumstantial evidence against Mr. Kinney was not insignificant, it was not so overwhelming as to foreclose any possibility of reasonable doubt. As the defense showed, there were substantial credibility issues with respect to the complaining witnesses' testimony. The physical evidence connecting Mr. Kinney to the complainants thus loomed large, and the defense theory was critically important because it could have provided an explanation for much of this evidence.

The admission of Mr. Kinney's stationhouse statement significantly undercut this theory, which the government recognized—it came back to the statement repeatedly in its closing and rebuttal. *Cf. Hill v. United States*, 858 A.2d 435, 448 (D.C. 2004) (finding that the admission of an unwarned statement was not harmless in part because it was "showcased in the government's closing argument"); *cf. DeLoach*, 504 F.2d at 191-92 (noting that if the defense's argument "had really been unimportant, the prosecutor would not . . . have devoted much of his rebuttal to ridiculing the theory").

The prosecutor used Mr. Kinney's postwarning statement to argue that it showed consciousness of guilt and to "undermin[e] [Mr. Kinney's prostitution-gone-wrong] theory." *Edwards*, 923 A.2d at 847. Because little else in the record necessarily contradicted Mr. Kinney's defense theory, "there is a 'reasonable possibility' that the statement and the prosecutor's arguments based on it contributed to the jury's . . . conviction." *Id.* (quoting *Smith*, 529 A.2d at 317).

## IV.

For the foregoing reasons, Mr. Kinney's convictions for armed robbery and PFCV are reversed, his fleeing conviction is affirmed, and the case is remanded for

further proceedings consistent with this opinion.[18]

*So ordered.*

---

[18] We do not reach Mr. Kinney's severance arguments because the issue "may not arise at all in any retrial, and, if [it does], it may be on a materially different factual record that we cannot predict." *Gilliam v. United States*, 80 A.3d 192, 211 (D.C. 2013). The government acknowledges that these offenses could be tried together only if identity is at issue. *See Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964). And the government's sole argument that identity was at issue in this trial is that "the jury had before it appellant's statement . . . that, at the times in question, he was incapacitated due to drug use, and that someone else likely took his keys and drove his car." Although the government noted at oral argument that the case could be retried in a different way that puts identity at issue even without the unwarned statements, that possibility can be litigated should it arise.